**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOSEPH J. GERMINARO, an individual, and GABRIELLA P. GERMINARO, an individual, | ) ) ) ) | Civil Action No. 14-1202 |
| Plaintiffs, | ) ) | Judge Nora Barry Fischer |
| v. | ) ) ) | |
| FIDELITY NATIONAL TITLE INSURANCE COMPANY, and COMMONWEALTH LAND TITLE INSURANCE COMPANY, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiffs Joseph and Gabriella Germinaro commenced this action on February 6, 2014 by filing a complaint in the Los Angeles Superior Court against Defendants Lawyers Title Insurance Company, Lawyers Title Insurance Corporation (collectively, "LTIC"),[1] Commonwealth Land Title Insurance Corporation ("CLTIC"),[2] and Does 1 through 100. Plaintiffs amended their complaint and, thereafter, the matter was removed to the United States District Court for the Central District of California. Plaintiffs filed the operative Second Amended Complaint ("SAC," ECF No. 12) on May 14, 2014, dropping their claims against the "Doe Defendants." On September 4, 2014, the Honorable Christina A. Snyder entered an order transferring the case to this district pursuant to 28 U.S.C. §1404(a) (ECF No. 29).

---

[1] The parties acknowledge that LTIC was merged into Fidelity National Title Insurance Company ("FNTIC") effective June 30, 2010, and FNTIC is the surviving company. (Stipulation to Amend Caption ¶3, ECF No. 63.) Accordingly, the case caption now reflects the substitution of FNTIC as the appropriate party-defendant in lieu of LTIC. (*See* Order dated Jan. 22, 2015, ECF No. 64.)

[2] It appears that CLTIC's corporate name is actually "Commonwealth Land Title Insurance *Company*," as reflected in the Second Amended Complaint and the Court's docket.

The SAC asserts claims against the named Defendants for: (1) aiding and abetting fraud; (2) fraud; (3) violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et seq.* ("RICO"); (4) breach of fiduciary duty; (5) aiding and abetting breach of fiduciary duty; (6) conversion of trust funds; (7) aiding and abetting conversion of trust funds; (8) intentional interference with a contract; (9) breach of the implied covenant of good faith and fair dealing; (10) breach of contract; and (11) negligence. These claims arise from Plaintiffs' attempt to effectuate a tax-deferred land exchange ("1031 exchange") pursuant to Section 1031 of the Internal Revenue Code, 26 U.S.C. §1031. As part of the 1031 exchange, Plaintiffs entrusted approximately $831,187 to LandAmerica 1031 Exchange Services, Inc. ("LES"), an entity which filed for bankruptcy relief less than a week after the money in question was transferred. In essence, Plaintiffs allege that LTIC, CLTIC, and LES – together with their parent company, LandAmerica Financial Group, Inc. ("LFG") – operated a Ponzi scheme. Plaintiffs claim that, as part of this scheme, Defendants LTIC and CLTIC induced the Plaintiffs to entrust their money to LES while making misrepresentations about and/or fraudulently concealing the fact that: (a) LES was on the brink of insolvency; (b) Plaintiffs' funds were being commingled with those of other LES clients; (c) Plaintiffs' funds were being used to complete the exchanges of LES' pre-existing clients; and (d) Plaintiffs were at substantial risk of losing their funds by placing them with LES.

Presently pending before the Court in this matter is the Defendants' Motion for Judgment on the Pleadings (ECF No. 49). For the reasons that follow, Defendants' motion will be granted, in part, and denied, in part.

## II. FACTUAL BACKGROUND[3]

Plaintiffs are residents of Pittsburgh, Pennsylvania who sought to effectuate tax-deferred, like-kind exchanges of property under Section 1031 of the Internal Revenue Code. (SAC ¶¶ 11-12.) This provision allows the seller of an investment property (a "relinquished property") to defer payment of the capital gains on the taxable proceeds of the sale of the relinquished property by using the proceeds to purchase a replacement property. (*Id.* ¶¶ 28-29.)

To qualify for tax-deferral treatment under §1031, the seller of the relinquished property must identify like-kind replacement property within 45 days of the sale of the relinquished property and then purchase the replacement property within 180 days from the sale of the relinquished property. (*Id.*) One caveat is that §1031 prohibits the seller of the relinquished property or his agents from taking actual or constructive receipt of the proceeds from the sale of the relinquished property at any time during the 180-day exchange period. (*Id.* ¶¶ 30-33.) Accordingly, a taxpayer can comply with the requirements of §1031, and thus preserve the tax-deferral benefit, by having a qualified intermediary ("QI") take possession of the sale proceeds ("exchange funds") in trust while a substitute replacement property is acquired; the QI then transfers the exchange funds directly to the escrow established to complete the purchase of the replacement property. (*Id.*)

In 2008, Plaintiffs attempted to execute a 1031 exchange after selling land located in Pittsburgh. (*Id.* ¶ 12.) Based on a recommendation from Alfred Watterson, an attorney employed by LTIC, Plaintiffs executed a 1031 exchange contract ("Exchange Agreement") with the Los Angeles branch of LES ("LES-LA"), which agreed to serve as the QI for Plaintiffs' exchange transaction. (*Id.* ¶¶ 12, 38, 39, 103-06.) Watterson designated a fellow LTIC

---

[3] Because the Court is writing for the parties, it will not set forth an exhaustive review of the allegations in Plaintiffs' Second Amended Complaint, which consists of 195 separate paragraphs. (ECF No. 12.)

employee, Tammy Bentz, to assist in the 2008 Exchange. (*Id.* ¶105.) Plaintiffs allege that, pursuant to Watterson's recommendation, they contacted various branches of LES to obtain the best quote for the costs of effectuating the 1031 exchange and received the most favorable quote from Whitney Walters, an employee at LES-LA. (*Id.* ¶106.) On November 17, 2008, Plaintiffs closed the sale on the relinquished property in Pittsburgh, utilizing LTIC as their escrow holder and instructing LTIC to entrust approximately $831,187 in net sale proceeds to LES. (*Id.* ¶¶ 104, 109.) Pursuant to the terms of the Exchange Agreement and Plaintiffs' escrow instructions to LTIC, these proceeds were to be maintained by LES in a segregated, FDIC-insured deposit account with Sun Trust Bank in Richmond, Virginia. (*Id.* ¶¶ 47, 109.)

Just one week after closing on the sale of their relinquished property, Plaintiffs received an email notifying them that LFG and LES intended to file petitions for relief under Chapter 11 of the Bankruptcy Code. (*Id.* ¶¶ 109-10.) Then, on November 26, 2008, LFG and LES filed Chapter 11 petitions in the United States Bankruptcy Court for the Eastern District of Virginia. (*Id.* ¶110)

On December 30, 2008, Plaintiffs filed an adversary proceeding against LES in the Bankruptcy Court in which they sought to recover their exchange funds and damages. (*See* Defs.' First Request for Judicial Notice ("RJN-D1"), Ex. B, ECF No. 49-1.) Plaintiffs claim they recovered substantially less than their original $831,187 in the Bankruptcy Action (*Id.* ¶121.)

In May 2010, Plaintiffs filed a complaint in Pennsylvania state court (hereafter, the "Pennsylvania Action") against Watterson and Bentz, who were involved in the 2008 Exchange. (*Id.* ¶ 123; RJN-D1 Ex. D.) Plaintiffs' second amended complaint in the Pennsylvania Action asserted claims for breach of contract, negligence, breach of fiduciary duty, and fraudulent

misrepresentation/nondisclosure.  (RJN-D1 Ex. D.)  Plaintiffs amended their complaint in the Pennsylvania Action in October 2012 to add LTIC as a defendant.  (SAC ¶125; RJN-D1 Ex. E.)

In November 2010, a class action suit (hereinafter, the "Class Action") was filed against LTIC and CLTIC in the United States District Court for the Northern District of California on behalf of persons who, like Plaintiffs, were allegedly "victimized by the LES Ponzi scheme." (SAC ¶124; RJN-D1 Ex. H, ECF No. 49-1.)  The Class Action complaint asserted claims for aiding and abetting breach of fiduciary duty, aiding and abetting conversion, negligence, breach of fiduciary duty, and constructive fraud.  (RJN-D1 Ex. H.)  Although the Class Action settled, Plaintiffs opted out of the settlement class in August 2012.  (SAC ¶123.)

In December 2013, the tort claims against LTIC in the Pennsylvania Action were dismissed as untimely.  (*Id.* ¶126, RJN-D1 Ex. G.)  Plaintiffs then commenced the instant action against LTIC and CLTIC in February 2014.

## III. PROCEDURAL BACKGROUND

On September 4, 2014, Judge Snyder entered an order transferring the case to this district pursuant to 28 U.S.C. §1404(a) (ECF No. 29).  Thereafter, Defendants filed a motion to dismiss the SAC (ECF No. 34).  In their motion, Defendants argued that:  (1) all of the Plaintiffs' claims are time-barred; (2) the SAC fails to allege the requisite elements of a RICO claim; and (3) the SAC fails to sufficiently allege the existence of a contract for purposes of Plaintiffs' claims premised on breach of contract, intentional interference with a contract, and implied covenant of good faith and fair dealing.  This Court denied the motion[4] on the grounds that the parties had

---

[4] The Court's Memorandum Order indicated that Defendants' motion to dismiss was being denied "with prejudice." (Mem. Order dated Oct. 21, 2014 at 1, ECF No. 45.)  Based on that language, Plaintiffs contend that the pending motion is procedurally inappropriate.  To the extent the language of the order suggested that Defendants' arguments could not be renewed under a different procedural rule, this was inadvertent and the Court will therefore entertain the pending motion on its merits.

failed to address the appropriate choice-of-law analysis in their briefing of the motion (ECF No. 45). The Court noted that Judge Snyder had transferred the case pursuant to 28 U.S.C. §1404(a) and, to that end, this Court was required to apply the choice of law principles of the transferor court. *See Van Dusen v. Barrack,* 376 U.S. 612, 639 (1964); *Amica Mut. Ins. Co. v. Fogel,* 656 F.3d 167, 171 (3d Cir. 2011), as amended (Dec. 9, 2011) (*citing Ferens v. John Deere Co.,* 494 U.S. 516, 530-31 (1990)). Consistent with the Court's order, Defendants filed their answer to the SAC (ECF No. 47) on November 25, 2014.

On December 5, 2014, Defendants filed the pending motion for judgment on the pleadings and supporting brief, essentially renewing the arguments previously raised in their original Rule 12(b) motion (ECF Nos. 49, 50). As before, Defendants argue that all of Plaintiffs' claims are outside of the applicable statutes of limitations and should therefore be dismissed as untimely. Defendants next argue that the SAC fails to state a viable RICO claim because: (a) it does not allege the existence of a "person" distinct from the alleged "enterprise" and (b) it does not allege a pattern of predicate acts with sufficient particularity. Finally, as to Plaintiffs' claims for breach of contract (Count 10) and breach of implied covenant of good faith and fair dealing (Count 9), Defendants once again seek dismissal on the grounds that the SAC fails to sufficiently allege the existence or terms of a contract, which is a necessary element for both causes of action.

In connection with their motion, Defendants filed a Request for Judicial Notice (hereafter, "RJN-D1," ECF No. 49-1), asking that this Court take judicial notice of the following documentary exhibits:

(A) Judge Snyder's Minute Order transferring the instant case from the U.S. District Court for the Central District of California to this judicial district;

(B) the coversheet and complaint that was filed by Plaintiffs in LES's bankruptcy proceeding in the U.S. Bankruptcy Court for the Eastern District of Virginia;

(C) the order of the bankruptcy court, entered on December 17, 2008, approving the purchase of CLTIC and LTIC;

(D) the second amended complaint (without exhibits) filed by Plaintiffs in the Pennsylvania Action, styled *Germinaro v. Lawyers Title Ins. Corp., et al.,* Case No. GD 10-009332 (Allegheny County Court of Common Pleas);

(E) the third amended complaint filed by Plaintiffs in the Pennsylvania Action;

(F) the docket from the LES bankruptcy proceedings;

(G) an order of the Allegheny County Court of Common Pleas, dated December 23, 2013, granting LTIC's motion for partial judgment on the pleadings in the Pennsylvania Action;

(H) the original complaint in the Class Action lawsuit, styled *Hays, et al., v. Commonwealth Land Title Ins. Co., et al.,* No. 10-5336 (N.D. Cal.);

(I) the first amended complaint in the Class Action;

(J) the Plaintiffs' brief in opposition to Defendants' motion for partial judgment on the pleadings filed in the Pennsylvania Action;

(K) Plaintiffs' "Opposition to Defendants' [original] Motion to Dismiss," filed in the instant action while the case was still pending before Judge Snyder in the Central District of California (*see* ECF No. 21); and

(L) a "Stipulation Regarding the Location of Plaintiffs' 'Replacement Property' Not Affecting the Progress of the Case" that was filed while this action was pending in the Central District of California (*see* ECF No. 16).

As the foregoing descriptions indicate, all of the documents in question were filed of record either in the instant case or in litigation related to this case.

On December 29, 2014, Plaintiffs filed their brief in opposition to the pending motion (ECF No. 54). Appended to the brief was Plaintiffs' own Request for Judicial Notice ("RJN-P," ECF No. 54-2). Plaintiffs are requesting that the following documentary exhibits be judicially noticed:

(A) a 2009 publication from the LandAmerica website describing the LES/LFG bankruptcy and the sale of its primary assets (CLTIC and LTIC) to Fidelity National Financial, Inc.;

(B) a November 24, 2008 article authored by Inman News, entitled "LandAmerica Scrambling for Cash";

(C) a November 26, 2008 Reuters article entitled "LandAmerica Files for Bankruptcy, Sells Businesses";

(D) a December 17, 2012 article from the Richmond-Times entitled "LandAmerica was the Victim of the Bad Economy";

(E) the first amended complaint in the Class Action (without exhibits);

(F) a docket entry from the LES/LFG bankruptcy proceeding entitled "Motion of Debtor for Order Pursuant to Sections 105(a) and 363(b) of Bankruptcy Code and Bankruptcy Rule 9019 Establishing Procedures to Settle Claims Involving Segregated Exchange Funds";

(G) an order entered on December 16, 2008 in the bankruptcy proceeding and docketed therein at ECF No. 362;

(H) an order entered on January 12, 2009 in the bankruptcy proceeding and docketed therein at ECF No. 650;

(I) a motion filed in the bankruptcy proceeding on May 4, 2009 seeking certain relief under Bankruptcy Code §§ 105(a) and 363(b) and Bankruptcy Rule 9019(a); and

(J) an order entered in the bankruptcy proceeding on May 14, 2009 and docketed therein at ECF No. 1409.

Defendants filed their reply brief on January 9, 2015 (ECF No. 56). That same day, they filed a second Request for Judicial Notice ("RJN-D2," ECF No. 57) relative to certain online records from the Nebraska Secretary of State's office indicating that LTIC is no longer an active corporation and has "merged out." Defendants also filed a brief (ECF No. 57-1) opposing the Plaintiffs' request for judicial notice insofar as it relates to Plaintiffs' Exhibits (A) through (D).

The Court held a case management conference and argument on the pending motion on January 15, 2015 (*see* Minute Entry at ECF No. 61). Subsequently, the Court ordered the parties to conduct supplemental briefing specifically addressing the Untied States Court of Appeals for the Third Circuit's opinion in *Schmidt v. Skolas,* 770 F.3d 241 (3d Cir. 2014) and the effect of that ruling on the issues of judicial notice, the statute of limitations, and the discovery rule (*see* ECF No. 67).

The parties filed their supplemental briefs on February 27, 2015 (ECF No. 68 and 69). Defendants also filed a motion (ECF No. 70) requesting leave to make a third request for judicial notice ("RJN-D3"), and the Court granted that motion (ECF No. 73). Defendants' RJN-D3 was filed on March 17, 2015 (ECF No. 74). In this latest request, Defendants ask that the Court take judicial notice of a document filed by Plaintiffs in the LFG/LES bankruptcy proceeding, which is styled "Objection to Joint Chapter 11 Plan of LandAmerica Financial Group, Inc. and Its Affiliated Debtors" (ECF No.74-1). With the filing of this latest submission by Defendants, all issues have been adequately joined, and the pending motion is fully ripe for disposition.

## IV. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "after the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Judgment on the pleadings is appropriate only when the movant "'clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.'" *Minnesota Lawyers Mut. Ins. Co. v. Ahrens,* 432 F. App'x 143, 147 (3d Cir. 2011) (*quoting Rosenau v. Unifund Corp.* 539 F.3d 218, 221 (3d Cir. 2008)). Where Rule 12(c) is invoked based on the theory that the plaintiff failed to state a viable claim, federal courts apply the same standard of review applicable to Rule 12(b)(6) motions. *See Woodend v. Lenape Reg'l High Sch. Dist.,* 535 F. App'x 164, 166 (3d Cir. 2013) (citation omitted). Thus, in order to survive a Rule 12(c) motion, the complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Third Circuit Court of Appeals has prescribed a three-step analysis to determine whether a claim is plausible. First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Second, the

court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id.; see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). Third, the court should assume the veracity of all well-pled factual allegations and then "'determine whether they plausibly give rise to an entitlement to relief.'" *Bistrian*, 696 F.3d at 365 (*quoting Iqbal*, 556 U.S. at 679). A claim is facially plausible when there is sufficient factual content from which to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," but the law does not impose a "probability requirement." *Id.* "Although factual allegations must be enough to raise a right to relief above the speculative level, … a plaintiff need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014) (internal quotations, citations, and alterations omitted). This third step of the analysis is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679).

## V. DISCUSSION

### A. DEFENDANTS' STATUTE OF LIMITATIONS ARGUMENT

Defendants' primary argument in support of their motion for judgment on the pleadings is that all of the claims in the SAC are beyond the applicable statutes of limitations and are

therefore time-barred. Plaintiffs, on the other hand, maintain that the relevant statutes of limitations were tolled for several reasons, making all of their claims timely. Plaintiffs agree that the 180-day period for completing their 1031 exchange expired, and the exchange thereby failed, in late May of 2009. Nevertheless, they aver that:

> [d]ue to the economic climate in this country in 2008-2010, and due to the nature of the LES Ponzi scheme and the efforts of those involved to conceal it, Plaintiffs were unable to discover they had been defrauded (or that any tort had been committed by the Defendants) for some time after the Bankruptcy filing by LFG/LES. Plaintiffs were unable to discover any such misconduct until, at the earliest, in or around May 2010, when they filed the Pennsylvania Action. Plaintiffs were unable to discover they had been victimized by a Ponzi scheme involving LTIC/CLTIC until later in 2010, because the Defendants engaged in conduct to conceal their massive fraud.

(SAC ¶127.) In addition, citing *American Pipe & Const. Co. v. Utah,* 414 U.S. 538 (1974), Plaintiffs assert that "[a]ny applicable statute of limitations was tolled at least between the time of the filing of the Class Action in November 2010, and the time Plaintiffs opted out of the Class Action Settlement in August 2012." (SAC ¶128.) Finally, Plaintiffs allege that:

> [d]ue to the fact that the Class Action was filed and the fact that Plaintiffs named LTIC and an LTIC representative in the Pennsylvania Action, any applicable statutes of limitations respecting the present claims against the Defendants were equitably tolled because the Defendants were alerted to the Plaintiffs' claims and because there is no prejudice that will befall the Defendants by allowing Plaintiffs to pursue their claims.

(SAC ¶129.)

Federal Rule of Civil Procedure 8 does not require that a complaint anticipate or overcome affirmative defenses such as the untimeliness of a claim; "thus, a complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense." *Schmidt v. Skolas,* 770 F.3d 241, 248 (3d Cir. 2014) (citing *In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 277 (3d Cir.2004)). Consistent with this rule, a defendant may raise the statute of limitations as a defense in a Rule 12(b)(6) motion only if it is apparent on the face of the complaint that the claims are time-barred. *Hickox v. County of Blair,* 591 F. App'x 107, 109 n.1 (3d Cir. 2014); *Schmidt,* 770 F.3d at 249. "[I]f the bar is not apparent on the face of the

11

complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Schmidt,* 770 F.3d at 249 (internal quotation marks and citation omitted). Federal courts have applied this same rule in the context of a motion for judgment on the pleadings. *See, e.g., Tozer v. Darby PA,* Civil Action No. 13–2005, 2014 WL 1378817, at *3 (E.D. Pa. Apr. 7, 2014) ("A defendant may raise the statute of limitations as a defense by way of a motion for judgment on the pleadings under Rule 12(c), if the statute's application is apparent on the face of the complaint."). Thus, the Court must determine whether the alleged untimeliness of Plaintiffs' claims is self-evident from the allegations in the SAC.

Here, however, the analysis is complicated somewhat by the fact that both sides have requested the Court to judicially notice the exhibits that they have submitted to support their arguments relative to the statute of limitations issue. In deciding a motion for judgment on the pleadings, federal courts may consider the pleadings and any attached exhibits, undisputedly authentic documents attached to the motion for judgment on the pleadings if plaintiff's claims are based on the documents, and matters of public record. *See Hammond v. U.S. Liability Ins. Co.,* No. 14cv0847, 2015 WL 401503, at *7 n.1 (W.D. Pa. Jan. 28, 2015). In addition, Rule 201(b) of the Federal Rules of Evidence allows federal courts to judicially notice a fact "that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." F.R.E. 201(b). The trial court "must take judicial notice if a party requests it and the court is supplied with the necessary information." F.R.E. 201(c)(2).

Except with respect to Plaintiffs' Exhibits (A) through (D), there is no dispute between the parties concerning their respective requests for judicial notice. In fact, Defendants' second request for judicial notice pertaining to LTIC's corporate extinction ("RJN-D2," ECF No. 57)

was previously granted (implicitly) by this Court when it approved the parties' stipulation to amend the case caption. (*See* ECF No. 64.) All of the remaining non-challenged exhibits consist of court filings or docket entries in this action or related litigation which are being submitted primarily to aid this Court's determination as to the timeliness of Plaintiffs' claims. Courts in this circuit have recognized the propriety of considering public records such as court filings in connection with a Rule 12(b) or 12(c) motion. *See, e.g., O'Boyle v. Braverman,* 337 F. App'x 162, 164 (3d Cir. 2009) (district court did not err in considering Tennessee state court documents for purposes of adjudicating Rule 12(b)(6) challenge on statute of limitations grounds); *Sands v. McCormick,* 502 F.3d 263, 268 (3d Cir. 2007) (court discussing its prior ruling in *Southern Cross Overseas Agencies v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 428 (3d Cir. 1999), and noting that "a court may take judicial notice of another court's opinion to use it as proof that evidence existed to put a party on notice of the facts underlying a claim"); *Macauley v. Estate of Nicholas,* 7 F. Supp. 3d 468, 478 n.7 (E.D. Pa. 2014) ("In resolving a motion under [Rule 12(c)], a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint.") (internal citation and quotation marks omitted); *Carpenters Combined Funds ex rel. Klein v. Klingman,* No. 2:10-cv-63, 2010 WL 3432837, at *2 (W.D. Pa. Aug. 25, 2010) ("[I]n resolving a Rule 12(b)(6) or 12(c) motion, a court may look beyond the complaint to matters of public record, including court files and records…") (*citing Pension Benefit Guar. Corp. v. White Consol. Indus*., 998 F.2d 1192, 1196 (3d Cir.1993)). Accordingly, this Court will take judicial notice of the filings insofar as they inform the Court's inquiry as to what was known to Plaintiffs concerning their alleged injuries and when such information was known.

As to the challenged exhibits, *i.e.,* Plaintiffs' Exhibits (A) through (D), the Court notes that these consist of one online publication from LFG's website addressing the LES/LFG bankruptcy proceedings and the sale of CLTIC and LTIC to Fidelity National Financial, Inc. and three news publications discussing the purported reasons for LFG's financial demise. These publications are not "public records" that may be considered in the context of a Rule 12(b)(6) or Rule 12(c) motion, *see Pension Benefit Guar. Corp.,* 998 F.2d at 1197 (explaining that "public record[s]" in this context include materials like criminal case dispositions, decision letters of government agencies, and published reports of administrative bodies), nor are the publications "integral" to the complaint – that is, Plaintiffs' claims are not "based" on the information in these articles. *See Schmidt,* 770 F.3d at 249 (explaining that "'[w]hat is critical is whether the claims in the complaint are based on an extrinsic document and not merely whether the extrinsic document was explicitly cited'") (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997)) (alteration in the original). Accordingly, this Court will not consider the content of these publications for the truth of the matters asserted therein, but the Court *will* take judicial notice of the *existence* of the publications. *See Selkridge v. United of Omaho Life Ins. Co.,* 360 F.3d 155, 162 n.5 (3d Cir. 2004) (taking judicial notice of the existence of a letter to the editor) (citing *Ieradi v. Mylan Laboratories, Inc*., 230 F.3d 594, 598 n. 2 (3d Cir. 2000) (appellate court may take judicial notice of the existence of a newspaper article), and *Peters v. Delaware River Port Authority of Pennsylvania and New Jersey*, 16 F.3d 1346, 1356 n. 12 (3d Cir. 1994) (same)). With this framework in mind, the Court considers the timeliness of Plaintiffs' federal and state claims, in turn.

1. Plaintiffs' Federal RICO Claim (SAC Count 3)

In Count 3 of the SAC, Plaintiffs allege that the Defendants violated RICO, 18 U.S.C. §1962(c) and (d), by participating in a 1031 Ponzi scheme that lasted from February 2008, when the ARS market froze, until November 26, 2008, when LES and LFG filed for bankruptcy protection. (SAC ¶¶ 153-162.) According to the SAC, "[t]he scheme and conspiracy was to run a 1031 Ponzi scheme at LES long enough for the ARS Freeze to thaw or for the enterprise to obtain capital from other sources to recharge the trust." (*Id.* ¶ 153.) This "required time and time could be obtained only by stealing other people's money to fund older Exchanges which [LES] could not fund because these LES customers' Exchange Funds were invested in the frozen ARS." (*Id.*) Plaintiffs allege that "CLTIC and LTIC assisted LES in misappropriating LES's clients' Exchange Funds with false promises and false LES solicitation materials to keep LES in business because the failure of LES would destroy the good will of CLTIC, LTIC and the LandAmerica brand." (*Id.* ¶ 154.) "The success of the scheme was dependent upon the ability to mislead clients regarding the safekeeping and use of the clients' Exchange Funds (or clients would not do business with LES) and to hide the ever-worsening financial condition of LES and LFG." (*Id.* ¶ 155.) Plaintiffs entered into their exchange agreement with LES on or around October 22, 2008 and, pursuant to that agreement, had their exchange funds wired to LES on or about November 21, 2008. (*Id.* ¶ 12.) Plaintiffs claim that their failed 1031 exchange was "the penultimate exchange LES engaged in prior to its Bankruptcy filing" on November 26, 2008. (*Id.* ¶¶ 12, 120.)

Civil RICO claims have a four-year statute of limitations period, *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.,* 483 U.S. 143, 156 (1987), which is not triggered until the plaintiff knew or should have known of his injury as well as the source of the injury, *Prudential Ins. Co. of America v. U.S. Gypsum Co.,* 359 F.3d 226, 233 (3d Cir. 2004) (citing *Forbes v. Eagleson,*

228 F.3d 471, 484-85 (3d Cir. 2000)). The statute of limitations period in a RICO case can be tolled where the plaintiff demonstrates fraudulent concealment. *Forbes*, 228 F.3d at 486-87. Fraudulent concealment "'is an equitable doctrine that is read into every federal statute of limitations,'" *Cetel v. Kirwan Fin. Group, Inc.,* 460 F.3d 494, 508 (3d Cir. 2006) (quoting *Mathews v. Kidder, Peabody & Co., Inc.,* 260 F.3d 239, 256 (3d Cir. 2001)), and "it will toll the RICO limitation period 'where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it.'" *Id.* at 509 (quoting *Mathews,* 260 F.3d at 256). In order to benefit from this equitable doctrine, the plaintiff must ultimately prove: "(1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts." *Id.* (citing *Mathews*, 260 F.3d at 256).

In this case, Plaintiffs filed their original complaint in the Los Angeles Superior Court on February 6, 2014. Thus, Plaintiffs' RICO claim is untimely if: (a) it accrued prior to February 6, 2010 and (b) the running of the statute of limitations was not otherwise tolled. Although Plaintiffs' 1031 exchange failed in late May of 2009, Plaintiffs maintain that they were unable to discover the source of their injury until the following year. More specifically, Plaintiffs claim they were unable to discover Defendants' tortious conduct until May of 2010, and they were unable to discover that they had been injured by a Ponzi scheme involving Defendants until around November 2010 due, in part, to "the nature of the LES Ponzi scheme and the efforts of those involved to conceal it." (SAC ¶127.) If Plaintiffs' allegations are credited, then the statute of limitations on Plaintiffs' RICO claim did not expire until May 2014 at the earliest, and the claim is therefore timely.

Defendants have pointed to various portions of the LES/LFG bankruptcy record which, they believe, show that Plaintiffs knew of their RICO injury by December 2008 or, at the latest, November 2009. (*See* RJN-D1 Ex. B, ECF No. 49-1; RJN-D3, ECF No. 74-1.) Although these filings provide fodder for Defendants' statute of limitations defense, they do not, in this Court's view, establish the untimeliness of Plaintiffs' RICO claim as a matter of law. As noted, fraudulent concealment is an equitable doctrine involving factual inquiries as to the Plaintiffs' diligence in uncovering the basis for their harm. Having carefully reviewed the record at hand, the Court finds that factual inquiries concerning Plaintiffs' diligence are better suited for revisitation at the summary judgment stage with the benefit of a more fully developed evidentiary record. *See, e.g., In re Community Bank of Northern Virginia*, 622 F.3d 275, 301-02 (3d Cir. 2010) ("[B]ecause the question whether a particular party is eligible for equitable tolling generally requires consideration of evidence beyond the pleadings, such tolling is not generally amenable to resolution on a Rule 12(b)(6) motion.").

Pursuant to Rule 12(c), a court may grant judgment on the pleadings in favor of a defendant on the basis of a statute of limitations defense only if it is clear from the face of the pleading that the defense applies. *Tozer v. Darby PA,* Civil Action No. 13–2005, 2014 WL 1378817, at *3 (E.D. Pa. Apr. 7, 2014). In applying this rule, the Court must take care not to improperly place the burden on plaintiff to plead around the statute of limitations defense. *See Schmidt,* 770 F.3d at 251 ("[W]hile a court may entertain a motion to dismiss on statute of limitations grounds, … it may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense.") (internal citation omitted). Here, the Court cannot say that it is apparent from the face of the SAC, together with the judicially noticed

exhibits, that Plaintiffs' RICO claim is untimely. Accordingly, judgment at this juncture is not warranted with respect to Count 3 of the SAC.[5]

2. Plaintiffs' State Law Claims

In determining whether Plaintiffs' state law claims are timely, this Court must initially determine which states' substantive law will govern its analysis. The Court previously observed that, because the instant case originated in California and was transferred to this judicial district by the U.S. District Court for the Central District of California pursuant to 28 U.S.C. §1404, California choice-of-law principles must govern our analysis. *See Van Dusen v. Barrack,* 376 U.S. 612, 639 (1964); *Amica Mut. Ins. Co. v. Fogel,* 656 F.3d 167, 171 (3d Cir. 2011), *as amended* (Dec. 9, 2011) (*citing Ferens v. John Deere Co.,* 494 U.S. 516, 530-31 (1990)).

California applies a "governmental interest" test, which proceeds in three steps:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.

> Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.

> Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*Frenzel v. AliphCom,* --- F. Supp. 3d ---, 2014 WL 7387150, at *4 (N.D. Cal., Dec. 29, 2014) (*quoting McCann v. Foster Wheeler LLC*, 225 P.3d 516 (Cal. 2010)). Here, Defendants maintain

---

[5] The Court's disposition of Count 3 makes it unnecessary for the Court to determine whether, and to what extent, Plaintiffs' other asserted bases for tolling would apply relative to the RICO claim.

that Pennsylvania law should be applied to determine the timeliness of all the state law claims, while Plaintiffs contend that either California or Nebraska law is applicable.

As an initial point, the Court will rule out Nebraska as a possible source of controlling law. The parties agree that Nebraska generally provides a longer statute of limitations period for each of the state law claims at issue here than either California or Pennsylvania would provide[6]; thus, an ostensible "conflict" of laws exists. Nevertheless, Nebraska has a substantially weaker interest in the application of its laws in this case than either California or Pennsylvania would have. Under California's "governmental interest" analysis, the state with the "predominant interest" in applying its laws is normally the state in which the underlying conduct occurs and is most likely to cause injury. *See Francis v. Wynn Las Vegas, LLC,* 557 F. App'x 662, 664 (9th Cir. Feb. 13, 2014) (citation omitted); *Castro v. Budget Rent-A-Car Sys., Inc.* 65 Cal. Rptr. 3d 430, 442 (Cal. Ct. App. 2007); *Cable v. Sahara Tahoe Corp.,* 155 Cal. Rptr. 770, 777 (Cal. Ct. App. 1979). Here, none of the events giving rise to Plaintiffs' state law claims occurred in Nebraska. The only connection that Nebraska has to the underlying events is the fact that LTIC and CLTIC were incorporated under Nebraska law. However, both companies engaged in business nationwide and maintained their principal offices outside of Nebraska. (*See* SAC ¶¶ 14-15). Moreover, LTIC does not even have a corporate existence any longer, as it merged into Fidelity National Title Insurance Company (a California company), while CLTIC never had any direct involvement with Plaintiffs. Given Nebraska's insignificant connection to this civil action, it clearly cannot provide the controlling law.

The choice between Pennsylvania and California is a closer question, requiring an examination of Plaintiffs' claims on a more particularized basis. Based on the analysis set forth

---

[6] *Compare* Defendants' Exhibit 2, presented at the time of the Court's hearing on this motion (ECF No. 61-3), and Plaintiffs' Exhibit 1 to the Declaration of Michael P. Denver in Support of Plaintiffs' Opposition to Defendants' Motion for Judgment on the Pleadings (ECF No. 54-1 at p.3).

below, the Court agrees with the Defendants that Pennsylvania law governs the issue of whether Plaintiffs' state law claims are timely.

a) SAC Counts 1, 2, 4, 5, 6 and 7

At step one of California's "governmental interest" analysis, we compare the states' respective statute-of-limitations periods to see if the laws differ. With regard to Plaintiffs' claims for fraud (Count 2), aiding and abetting fraud (Count 1), breach of fiduciary duty (Count 4), aiding and abetting breach of fiduciary duty (Count 5), conversion (Count 6), and aiding and abetting conversion (Count 7), the laws of Pennsylvania and California do differ in that Pennsylvania imposes a two-year statute of limitations period for these torts, *see* 42 PA. CONS. STAT. ANN. §5524(3) (two-year period for actions based on the taking or injuring of personal property, including actions for specific recovery thereof), *id.* §5524(7) (residual two-year statute of limitations period for actions found on negligent, intentional, or otherwise tortious conduct), *Envtl. Equip. & Serv. Co. v. Wachovia Bank,* 741 F. Supp. 2d 705, 727-28 (E.D. Pa. 2010) (noting that "courts examining Pennsylvania law generally apply a two-year statute of limitations on aiding and abetting claims") (citing authority), whereas California imposes at least a three year limitations, *see* CAL. CIV. PROC. CODE §338(c)(1) (three-year statute of limitations for actions pertaining to the taking, detaining, or injuring of any goods or chattels); *id.*§338(d) (three-year limitations period for actions seeking relief on the ground of fraud or mistake); *id.* §343 (residual four-year statute of limitations period for actions not otherwise specified).[7] Thus, a conflict of laws exists with respect to Counts 1, 2, 4, 5, 6, and 7 of the SAC.

---

[7] Defendants contend that the relevant limitations period for breach of fiduciary duty in California is three years, whereas Plaintiffs contend that it is either three or four years. For purposes of the present discussion, it is sufficient merely to note that California's limitations period for breach of fiduciary duty claims is longer than the period provided under Pennsylvania law.

At step two of the "governmental interest" analysis, we consider whether a "true conflict" exists by examining each jurisdiction's interest in the application of its own law under the circumstances of the particular case. A "true conflict" arises only when both jurisdictions have a policy interest in the application of their respective laws. *See Vestal v. Shiley Inc.,* No. SACV96-1205-GLT (EEX), 1997 WL 910373, at *2 (C.D. Cal. Nov. 17, 1997). Relevant to our analysis is California's "borrowing statute," which provides that:

> [w]hen a cause of action has arisen in another State, or in a foreign country, and by the laws thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against him in this State, except in favor of one who has been a citizen of this State, and who has held the cause of action from the time it accrued.

CAL. CIV. PROC. CODE §361. This statute makes clear that, if a claim arose in a forum outside of California and is time-barred in that forum, a non-resident plaintiff cannot avoid that time-bar by bringing the claim in California because California will "borrow" the statute of limitations laws from the forum in which the claim arose. *See Zarika v. Bank of India,* Case No. 3:12-cv-4926, 2014 WL 931097, at *5 (N.D. Cal. March 5, 2014) (citing *Cossman v. Daimler Chrysler Corp.,* 133 Cal. Rptr. 2d 376, 380 (Cal. Ct. App. 2003)).

Defendants contend that there is no "true conflict" relative to the statute of limitations issue because, even if California and Pennsylvania differ in terms of their respective limitations periods, California's borrowing statute would require the application of Pennsylvania law. This line of argument raises two questions: (1) whether Plaintiffs' claims arose in Pennsylvania and, if so, (2) whether Pennsylvania law would render the foregoing claims untimely.

Courts applying California's borrowing statute have used varying criteria to determine where a claim "arose." Some courts have made this determination based on the forum in which the injury occurred. *See, e.g., Chang v. Baxter Healthcare Corp.,* 599 F.3d 728, 733-34 (7th Cir. 2010) (concluding that a tort claim "arises" under California law where the injury occurred).

21

Other courts have determined where a claim "arises" based on the location where the underlying events occurred. *See, e.g., Cornett v. Gawker Media, LLC,* No. 2:13-cv-01579-GMN-CWH, 2014 WL 7330940, at *3 (D. Nev. Dec. 19, 2014) ("Under California's borrowing statute, to determine where a tort action arose, a 'court must look to the time when, and the place where, the act is unlawfully committed or omitted.'") (*quoting Dalkilic v. Titan Corp.,* 516 F. Supp. 2d 1177, 1185 (S.D. Cal. 2007)); *Vestal v. Shiley, Inc.,* No. SACV96-1205-GLT(EEX), 1997 WL 910373, at *2 (C.D. Cal. Nov. 17, 1997) (for purposes of California's borrowing statute, "a claim 'arises' where the events underlying the cause of action occurred.").

Under either line of analysis, the Court concludes that the claims at issue here "arose" in Pennsylvania. The transaction underlying all of Plaintiffs' state law claims involved Pennsylvania residents who relinquished property located in Pennsylvania, attempted to use their sales proceeds to purchase replacement property located in Pennsylvania, and suffered financial loss in Pennsylvania. (SAC ¶11, RJN-D1, Ex. L, ECF No. 49-1.) Plaintiffs' tort claims are premised primarily on LTIC's actions in: (a) referring Plaintiffs to LES, while allegedly knowing, but failing to disclose, that LES was in dire financial straits; (b) providing Plaintiffs with allegedly fraudulent Exchange Agreements on behalf of LES which Plaintiffs then executed with LES; (c) providing Plaintiffs promotional materials on behalf of LES that allegedly contained false representations about the security of their funds; and (d) physically transmitting Plaintiffs' escrowed Exchange Funds to LES, while allegedly knowing that the funds would be improperly converted to pay off older clients. (SAC ¶¶ 7, 132, 137, 165, 170, 174, 176.)[8] The SAC makes clear that these acts were carried out by LTIC through its local agents in

---

[8] To the extent Plaintiffs' claims against CLTIC are premised on CLTIC's similar conduct vis-a-vis other LES clients, (and to the extent Plaintiffs have grounds to seek relief based on such conduct), the SAC is not clear about when and where such conduct allegedly occurred, other than to suggest it occurred in thousands of transactions nationwide. (*See, e.g.,* SAC ¶¶ 1-9, 15, 157, 158.)

Pennsylvania, with whom Plaintiffs dealt directly.[9]  (*See generally* SAC ¶¶ 99-122; *see also* RJN-D1 Ex. D and E, ECF No. 49-1.)

California's only relationship to the underlying events arises from the fact that Plaintiffs selected LES-LA as their Qualified Intermediary based on advice received from LTIC's Pennsylvania agent.  (SAC ¶¶ 104, 106.)  However, LES (a Maryland corporation with its principal place of business in Virginia) is not a party to this lawsuit, and, although LES served as the Plaintiffs' QI, the Exchange Agreement allegedly provided that Plaintiffs' funds would be held in an account maintained by LES at SunTrust Bank in Virginia.  (*See* SAC ¶ 47).  Plaintiffs nevertheless insist that their claims arose in California because they were allegedly ensnared in the fraud by misconduct (*i.e.,* mail and wire fraud) that was initiated in and orchestrated by LES-LA.  (*See* Pl.s' Mem. Opp. to Def.s' Mot. Judg. on the Pleadings at 10-11, 15, ECF No. 54.)  This allegation that the fraud was "orchestrated" from California is at odds with Plaintiffs' averment that the Ponzi scheme operated nation-wide in various jurisdictions.  (*See* SAC ¶ 157.)  Moreover, Plaintiffs have averred that the allegedly fraudulent materials in question were approved and/or supplied by LTIC's Pennsylvania agents.  (SAC ¶¶ 22, 108; RJN-D1 Ex. D, ¶20, ECF no. 49-1.)  Thus, even if the allegedly fraudulent materials originated in California, it is clear from the SAC that Defendants' Pennsylvania agents were instrumental in making those materials available to Plaintiffs in Pennsylvania, where the detrimental reliance occurred.  For these reasons, this Court is in agreement with Judge Snyder's prior observation that "the vast majority of the operative events appear to have occurred in Pennsylvania, where plaintiffs sought to effectuate [their 1031] Exchange and were allegedly defrauded by LTIC's agents."  (RJN-D1,

---

[9] To the extent Plaintiffs allege that the directive for these actions came from LTIC's "senior management" (*see, e.g.* SAC ¶ 7), Plaintiffs are not clear about which executives were involved or where they were located at the time the directive was allegedly given; however, the tortious acts by LTIC's agents were clearly consummated in Pennsylvania.

Ex. A at 11, ECF No. 49-1.) Accordingly, under any line of analysis, the Court concludes that Plaintiffs' claims, as set forth in Counts 1, 2, 4, 5, 6 and 7 of the SAC, arose in Pennsylvania.

Having determined that the foregoing claims arose in Pennsylvania, this Court must next determine whether they are time-barred under Pennsylvania law. As noted, Pennsylvania applies a two-year statute of limitations to these claims. "The general rule [in Pennsylvania] is that the statute of limitations begins to run as soon as a right to institute and maintain suit arises." *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 231 (3d Cir. 2003) (*citing Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000)). However, Pennsylvania also employs a "discovery rule," which has been described as follows:

> The discovery rule tolls the statute of limitations until such time as the tort and the existence of the tortfeasor should have reasonably been discovered. *Fine v. Checcio*, 870 A.2d 850 (Pa. 2005). "[T]he salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause." *Id.* at 858. Further, "[w]hile reasonable diligence is an objective test, it is sufficiently flexible ... to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question. Under this test, a party's actions are evaluated to determine whether he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others." *Id.* (citation omitted).

*Glencannon Homes Ass'n, Inc. v. North Strabane Tp.*, --- A.3d ----, 2015 WL 1809237, at *6 (Pa. Commw. Ct. 2015).

As previously noted, Plaintiffs have alleged that they could not have discovered any tortious misconduct on the part of Defendants until May 2010, at the earliest, "[d]ue to the economic climate in this country in 2008-2010, and due to the nature of the LES Ponzi scheme and the efforts of those involved to conceal it." (SAC ¶ 127.) Assuming this allegation is credited, the statutes of limitations for Counts 1, 2, 4, 5, 6 and 7 would still have expired two years later in May 2012 -- well before this action was commenced, unless the limitations periods

were otherwise tolled. Here, Plaintiffs contend that their claims were tolled by virtue of two doctrines: (a) first, they claim that any applicable statute of limitations was tolled between November 2010, when the Class Action was filed, and August 2012, when they opted out of the settlement class (SAC ¶ 128); and (b) second, they claim that the statutes of limitations were equitably tolled by virtue of the fact that the Class Action and the Pennsylvania Action gave Defendants notice of the Plaintiffs' claims and, therefore, no prejudice will befall the Defendants by allowing Plaintiffs to pursue their claims in this litigation (SAC ¶129). The Court concludes that neither tolling theory is viable under Pennsylvania law.

Under the rule first articulated by the Supreme Court of the United States in *American Pipe & Constr. Co v. Utah,* 414 U.S. 538 (1974), the filing of a class action complaint "suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id*. at 554. The Court believed a contrary holding "would deprive Rule 23 class actions of the efficiency and economy of litigation," as proposed class members would be inclined to file suit in the event the court later found the proposed class unsuitable. *Id*. at 553. The Court later expanded the *American Pipe* doctrine, holding that "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 354 (1983).

*American Pipe* and *Crown, Cork & Seal* involved a federal statute of limitations period as it related to a federal cause of action; presently, however, we are concerned with Plaintiffs' various state law claims. It is well established that a federal court sitting in diversity applies state law in determining whether a statute of limitations has been tolled. *See Guaranty Trust Co. v. York*, 326 U.S. 99, 110 (1945). This principle extends to issues of class tolling. *See, e.g., Casey*

25

*v. Merck & Co., Inc.,* 653 F.3d 95, 100 (2d Cir. 2011) (joining "the majority of our sister courts" which have held that "a federal court evaluating the timeliness of state law claims must look to the law of the relevant state to determine whether, and to what extent, the statute of limitations should be tolled by the filing of a putative class action.") (citing authority).

Therefore, in this case, the applicable statutes of limitations were tolled during the pendency of the prior Class Action only if the *American Pipe* rule applies under the laws of Pennsylvania. Insofar as Plaintiffs' state law claims are concerned, Plaintiffs cannot claim the benefit of class tolling under *American Pipe* and *Crown, Cork & Seal* because the Class Action in this case was initiated in California, and Pennsylvania does not recognize *American Pipe* tolling in cross-jurisdictional cases. *See Ravitch v. Pricewaterhouse,* 793 A.2d 939, 944 (Pa. Super. Ct. 2002).[10] Plaintiffs' arguments to the contrary are not persuasive. Accordingly, Plaintiffs' state law claims were not tolled by the pendency of the Class Action.

Plaintiffs fare no better in arguing that their claims should be equitably tolled. Pennsylvania recognizes equitable tolling in limited situations where there has been fraudulent concealment by the defendant or other circumstances which prevented the plaintiff from discovering his injury or asserting his rights in a timely fashion. *See, e.g., K.A.R. v. T.G.L.,* 107 A.3d 770, 780 (Pa. Super. Ct. 2014) (explaining that the doctrine of "fraudulent concealment" is "based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts"); *O'Kelly v. Dawson,* 62 A.3d 414, 420 (Pa.

---

[10] When a state's highest court has not spoken on a subject, a federal district court must attempt to predict how that tribunal would rule. *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.,* 80 F.3d 90, 93 (3d Cir. 1996) (citation omitted). In making such determinations, the court must give due deference to the decisions of lower Pennsylvania courts. *Id.* (citation omitted). "The rulings of intermediate appellate courts must be accorded significant weight and should not be disregarded absent a persuasive indication that the highest state court would rule otherwise." *Id.* (citation omitted). Plaintiffs have not suggested any reason why the Pennsylvania Supreme Court would decline to follow the ruling in *Ravitch.*

Super. Ct. 2013) ("Equitable tolling is permitted under the discovery rule only when, despite the exercise of due diligence, the injured party is unable to know of the injury or its cause."); *Garlick v. Lock Haven Univ.*, No. 540 C.D. 2008, 2008 WL 9405237, at *3 (Pa. Commw. Ct. 2008) (discussing equitable tolling in the context of administrative complaints filed with the Pennsylvania Human Relations Commission and stating that "a claim filed beyond the 180-day time limit may be permitted where the defendant actively misleads the plaintiff regarding the cause of action; where extraordinary circumstances prevent the plaintiff from asserting his rights; and where a plaintiff has asserted his rights in a timely fashion, but in the wrong forum").

For present purposes, the Court credits Plaintiffs' allegation that they could not have discovered the Defendants' tortious conduct prior to May 2010 due, in part, to Defendants' fraudulent concealment of their unlawful conduct. Even if we assume that the statutes of limitations were tolled until May 2010, however (or, for that matter, November 2010), Plaintiffs' claims in Counts 1, 2, 4, 5, 6, and 7 are untimely because there is no basis upon which the relevant limitations period could have been tolled any further under Pennsylvania law.

Plaintiffs contend that their claims should be equitably tolled because they had previously asserted claims against Defendants both in the California Class Action and in the Pennsylvania Action and, consequently, Defendants were on notice of the claims against them and suffered no prejudice by having the claims reasserted in this litigation. However, Pennsylvania courts do not appear to permit equitable tolling based solely on the fact that a plaintiff has previously commenced related litigation in a different, albeit appropriate, forum. *See Suburban East Tires, Inc. v. Pennsylvania Pub. Util. Comm'n,* 582 A.2d 727, 729 (Pa. Commw. Ct. 1990) ("[I]t has previously been determined that pendency of a parallel action in another forum does not toll the running of the applicable statute of limitation.") (citation omitted); *see also Ravitch,* 793 A.2d at

942-43 (noting that, in Pennsylvania, the filing of an action in state court does not toll the statute of limitations against a subsequent action filed in federal court). Beyond the allegations of fraudulent concealment which the Court has already credited, Plaintiffs make no allegations of extraordinary circumstances that prevented them from asserting their rights in a timely fashion, nor have they alleged that they timely asserted their rights in the "wrong" forum.[11]

In sum, then, Pennsylvania law does not afford Plaintiffs any basis for tolling the statutes of limitations on their claims for fraud, aiding and abetting fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, or aiding and abetting conversion after 2010. Lacking the benefit of any additional tolling, Plaintiffs' claims under Counts 1, 2, 4, 5, 6, and 7 are time-barred. Accordingly, California's "borrowing statute" requires that the claims be found time-barred under California law as well. *See Tibbetts v. Syntex Corp.,* 996 F.2d 1227 (9th Cir. 1993) (noting the "general rule" that California's "borrowing statute" applies the borrowed statute of limitations "with all its accouterments," including tolling rules) (citation omitted). As Defendants correctly observe, there is no true conflict of laws because, under either Pennsylvania or California law, the aforementioned claims are untimely. Defendants' motion for judgment on the pleadings will therefore be granted as to Counts 1, 2, 4, 5, 6 and 7 of the SAC.

b) <u>SAC Counts 8 and 11</u>

___

[11] Plaintiffs cite *Sincavage v. Cameron*, Civil Action No. 11-cv-7813, 2014 U.S. Dist. LEXIS 63185, at *17 (E.D. Pa. Mar. 28, 2014) for the proposition that equitable tolling applies where a petitioner has diligently attempted to pursue his rights. In actuality, *Sincavage* states that "[a] petitioner is 'entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, *and (2) that some extraordinary circumstances stood in his way and prevented timely filing.*'" *Id.* at*17 (quoting *Holland v. Florida,* 560 U.S. 31, 649 (2010)) (emphasis added). Thus, *Sincavage* does not expand the legal landscape in terms of circumstances which may justify equitable tolling. However, even if *Sincavage* could be read to suggest that mere diligence on the part of the plaintiff is sufficient grounds for invoking the doctrine, this would not help Plaintiffs relative to their state law claims. *Sincavage* involves a federal claim filed by a state prisoner under 28 U.S.C. §2254 and, as such, it implicates federal tolling principles rather than Pennsylvania state tolling principles.

In Counts 8 and 11 of the SAC, Plaintiffs assert claims for intentional interference with a contract and negligence, respectively. Based on the considerations previously discussed, the Court concludes that the claims in Counts 8 and 11 arose in Pennsylvania. Plaintiffs' intentional interference claim is premised largely upon the fact that, due to the failure of their 1031 exchange, Plaintiffs could not consummate the purchase of their replacement property in Pennsylvania. (*See* SAC ¶ 179; RJN-D1, Ex. L, ECF No. 49-1.) Plaintiffs' negligence claim is based primarily on the conduct of LTIC's Pennsylvania agents who, at the behest of "senior management," breached their duties of care by referring Plaintiffs to LES, printing and distributing the allegedly fraudulent LES Exchange Agreement, misrepresenting to Plaintiffs that their exchange funds would be safeguarded in a segregated account, and using the interstate wire system to physically transmit escrowed Exchange Funds to LES, knowing the funds would be converted to pay off prior LES clients. (SAC ¶¶ 193.) These tortious actions occurred in Pennsylvania, the injury was incurred in Pennsylvania, and, hence, Plaintiffs' claims for negligence and intentional interference with a contractual relationship arose here.

With respect to the claims set forth in Counts 8 and 11, both California and Pennsylvania impose a two-year statute of limitations. *See* 42 Pa. Cons. Stat. Ann. §5524(7), and *Knoell v. Petrovich,* 90 Cal. Rptr. 2d 164, 168 (Cal. Ct. App. 1999) (discussing intentional interference with a contractual relationship); Cal. Civ. Proc. Code §339(1)). Like the claims set forth in SAC Counts 1, 2, 4, 5, 6 and 7, Plaintiffs' claims at Counts 8 and 11 are time-barred under Pennsylvania law because: (a) Plaintiffs admit that, despite Defendants' acts of fraudulent concealment, they could have discovered the Defendants' misconduct by May 2010 or (at the latest) November 2010; (b) Pennsylvania does not recognize *American Pipe* tolling in the circumstances that exist here; (c) no facts are alleged that would make equitable tolling

applicable after 2010; and (d) the two-year statute of limitations period therefore expired no later than November 2012, or more than a year prior to the filing of this lawsuit.

Because Counts 8 and 11 are time-barred under Pennsylvania law, California's borrowing statute requires that the claims be treated as untimely under California law as well. Thus, the Court need not decide whether California would recognize class tolling or equitable tolling in this case; even if it would, application of California's borrowing statute means that no "true conflict" exists because California does not have an interest in applying its own tolling doctrines in order to save a claim arising in Pennsylvania that is time-barred under Pennsylvania law. Accordingly, Defendants' motion for judgment on the pleadings will be granted as to Counts 8 and 11 of the SAC.

c) SAC Counts 9 and 10

In Counts 9 and 10 of the SAC, respectively, Plaintiffs assert claims against LTIC for breach of the implied duty of good faith and fair dealing and breach of contract. The essence of these claims is that LTIC breached its duties as an escrow agent and fiduciary by failing to place Plaintiffs' money with a legitimate QI so that it would be kept safe and could be utilized to complete the Plaintiffs' 1031 exchange. (SAC ¶¶ 182-83, 187-88.) According to the SAC, LTIC's contractual duties to Plaintiffs are derived from two sources: (i) Plaintiffs' written escrow instructions to LTIC's Pennsylvania agents, and (ii) a "written contract" which LTIC allegedly entered into with LES "and/or other LandAmerica entities" pursuant to which LTIC agreed to perform escrow services for clients and wire their exchange funds to LES. (*Id.*)

Both California and Pennsylvania apply a four-year statute-of-limitations period to claims for breach of contract and breach of implied duty of good faith and fair dealing. *See* 42 PA. CONS. STAT. ANN. §5525(a)(8) (residual 4-year limitations period for "action[s] upon a contract

… founded upon a writing"), CAL. CIV. PROC. CODE §337(1) (4-year limitations period for an "action upon any contract, obligation or liability founded upon an instrument in writing"). To the extent that the two jurisdictions differ materially in their tolling laws, however, this Court concludes that Pennsylvania law governs the timeliness inquiry.[12]

First, the allegations in the SAC indicate that the claims in question "arose" in Pennsylvania. California courts analyzing breach of contract claims appear to focus on the forum in which the plaintiffs anticipated they would enjoy the benefits of the contract. In *McKee v. Dodd,* 93 P. 854 (Cal. 1908), for example, the California Supreme Court held that a claim for breach of payment on a note "arose" in New York, where the note was payable and where the payee resided. 93 F.3d at 856; *see also Somaya v. Bank of India,* 2014 WL 931097, at *5 (N.D. Cal. Mar. 5, 2014) (action for payment on an account arose in California, where the account was payable and where the payee resided). Similarly, in *W. Coat & Min. Co. v. Jones,* 167 P.2d 719 (Cal. 1946), the California Supreme Court determined that a contract claim "arose" in the state where the notes in question were payable and contract was to be performed. 167 P.2d at 725.

Here, LTIC's alleged contractual duties required that it safeguard Plaintiffs' 1031 exchange funds from the sale of a Pennsylvania property by placing the monies with a legitimate QI so that the money could be used to complete Plaintiffs' 1031 Exchange with the purchase of another Pennsylvania property. Plaintiffs are Pennsylvania residents and sought to obtain the benefit of LTIC's contractual obligations in this Commonwealth. The injury as a result of the alleged breach impacted the Plaintiffs in Pennsylvania. In addition, at least one of the alleged contracts (*i.e.*, the written escrow instructions) was executed in Pennsylvania by LTIC's agents

---

[12] Plaintiffs appear to implicitly concede that their claims at Counts 9 and 10 are governed by Pennsylvania law, (see Pl.'s Mem. Opp. to Def.s' Mot. Judg. on Pleadings at 8, ECF No. 54 (arguing only that California or Nebraska law governs the "intentional tort" claims)); however, this Court independently arrives at this same conclusion under applicable conflict-of-laws principles.

doing business in Pennsylvania.[13]   Accordingly, the Court is satisfied that the Plaintiffs' claims

for breach of contract and breach of implied duties of good faith and fair dealing "arose" in

Pennsylvania.

Having determined that Plaintiffs' claims at Counts 9 and 10 arose in Pennsylvania, the

Court next concludes that these claims are untimely under Pennsylvania law.  As noted, Counts 9

and 10 basically aver that LTIC breached its duties as an escrow agent and fiduciary by failing to

keep Plaintiffs' money safe and secure in a segregated account for purposes of completing their

1031 exchange.  Here, the SAC is clear that Plaintiffs closed on the sale of their relinquished

property in November 2008 and had 180 days thereafter in which to complete the purchase of

their replacement property.  (SAC ¶¶ 12, 28, 32-33, 109.)  Based on their own allegations, it was

clear to Plaintiffs no later than mid-2009 that they would not have their funds available for

purposes of completing the exchange in a timely fashion.  Therefore, the claim is time-barred,

unless Plaintiffs can avail themselves of one or more tolling doctrines.

As noted, Plaintiffs have alleged various tolling theories, but none of them are helpful

with respect to Counts 9 and 10.  With respect to their theory of delayed discovery, Plaintiffs

claim that they were "unable to discover that they had been *defrauded*" or "*that any tort had

been committed* by the Defendants" until May 2010 at the earliest, due to the economic climate

and Defendants' fraudulent concealment of the Ponzi scheme.  (SAC ¶ 127) (emphasis added).

However, Plaintiffs make no allegation that they were prevented from discovering the basis for

their breach of contract claims, which were known (or knowable) when the exchange failed in

late May 2009.  Plaintiffs' assertion of class tolling under *American Pipe* also does not help them

because, as we have previously discussed, Pennsylvania does not recognize *American Pipe*

---

[13] It is not clear from the SAC when and where the alleged contract(s) between LTIC and LES was/were executed.

tolling under the circumstances of this case. Finally, Pennsylvania does not allow for equitable tolling based merely on the fact that Plaintiffs were pursuing litigation against LTIC in a different forum.

In sum, Plaintiffs' claims at Counts 9 and 10 were discoverable in mid-2009 and they became untimely in mid-2013, well before this action was commenced in Los Angeles Superior Court. Because Plaintiffs' claims arose in Pennsylvania and are untimely under Pennsylvania law, California's "borrowing statute" requires that the claims be treated as untimely under California law as well. Accordingly, Defendants' motion for judgment on the pleadings will be granted with respect to Counts 9 and 10 of the SAC.


B.   DEFENDANTS' SUBSTANTIVE CHALLENGES TO THE RICO CLAIM

In light of the foregoing analysis, Plaintiffs' sole remaining claim is their claim at Count 3 for alleged RICO violations, 18 U.S.C. §§1962(c) and (d). In addition to challenging the timeliness of this claim, Defendants argue that the SAC fails to plead the necessary elements of a §1962(c) violation.[14]

Section 1962(c) prohibits "any person employed by or associated with any enterprise" engaged in interstate commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…" 18 U.S.C. §1962(c). For purposes of establishing a §1962(c) violation, the defendant "person" and the RICO "enterprise" must be separate and distinct. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) (recognizing the "basic principle that to establish liability under § 1962(c)

---

[14] Defendants also challenge the sufficiency of the SAC as it relates to the alleged contracts that serve as the predicate for Plaintiffs' claims at Counts 9 and 10. Because the Court has already found these claims to be untimely, it is not necessary for the Court to address Defendants' alternative arguments for dismissal.

one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name"). Beyond this requirement, a plaintiff pleading a §1962(c) violation must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Kolar v. Preferred Real Estate Investments, Inc.,* 361 F. App'x 354, 362 (3d Cir. 2010) (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985) and *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004), *abrogated in part on other grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).

Defendants contend that Plaintiffs' RICO count fails because they have failed to plead a "person" that is distinct from the alleged "enterprise." Under RICO, an "enterprise" includes "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact, though not a legal entity." 18 U.S.C. §1961(4). For purposes of §1962(c), the defendant "person" and the RICO "enterprise" must be separate and distinct, *Cedric Kushner Promotions, Ltd.,* 533 U.S. at 161, because it would be illogical to say that a corporate "person" was employed by or associated with itself. *See B.F. Hirsch v. Enright Ref'g Co.,* 751 F.2d 628, 633 (3d Cir. 1984), *abrogated in non-relevant part by Sedima v. Imrex Co.*, 473 U.S. 479 (1985)). Thus, to establish liability under §1962(c), a plaintiff must show that the defendant "person" "'conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs.'" *Cedric Kushner Promotions, Ltd.,* 533 U.S. at 163 (*quoting Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (emphasis in the original). *See also Lorenz v. CSX Corp.,* 1 F.3d 1406, 1412 (3d Cir. 1993) (noting that it is "theoretically possible" for a parent corporation to be a RICO "person" and its subsidiaries to be the "enterprise," provided the "parent corporation played a role in the racketeering activity which is distinct from the activities of the subsidiary.").

Here, Plaintiffs have alleged an enterprise consisting of more than just the defendant "persons" (*i.e.*, LTIC and CLTIC) conducting their own affairs through their subsidiaries and employees; rather, Plaintiffs allege an "enterprise" consisting of CLTIC, LTIC, their subsidiaries, their parent corporation (LFG), their sister corporation (LES), and various interlocking officers and directors of these entities, as identified in the SAC. According to the SAC, the focus of the "enterprise" was to perpetuate a 1031 Ponzi scheme at LES and, to that end, Defendants assisted the enterprise in numerous ways, including injecting cash into LES for the purpose of allowing LES to make "lulling payments" and thereby perpetuate the Ponzi scheme. The SAC avers that, unlike Defendants LTIC and CLTIC (who operated in a unitary business fashion with LFG for the purpose of underwriting title insurance policies), LES operated outside of LFG's centralized cash management system, traditionally accounted for less than one percent of LFG's revenue, and was not engaged in the title insurance industry but rather, conducted business as a "qualified intermediary" for purposes of Section 1031 of the Tax Code. (*See generally* SAC ¶¶ 18, 153-57.) Defendants' motion does not address these allegations or the implication they may have concerning the purported distinction between the Defendants and the alleged "enterprise." For present purposes, however, the Court finds Plaintiffs' averments sufficient to establish a plausible distinction between the defendant "persons" and the subject "enterprise." *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (*quoting Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). To the extent discovery reveals that the "enterprise" in its actual operation was not, in fact, distinct from the Defendant "persons," this deficiency can be addressed at a later procedural stage by means of a Rule 56 motion.

Defendants next argue that Plaintiffs have failed to adequately plead a pattern of predicate acts. The Court of Appeals has explained that:

> "… a pattern of racketeering activity requires at least two predicate acts of racketeering activity, which include indictable offenses under the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343." *Lum [v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir.2004)]; 18 U.S.C. § 1961(5). Those statutory provisions, in turn, prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud. *See Lum*, 361 F.3d at 223. "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* (quoting *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 528 (3d Cir. 1998) (in turn quoting *Kehr Packages*, [*Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (1991)])). Stated differently, "[t]he scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane, or overreaching.'" *Kehr Packages*, 926 F.2d at 1415 (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987) (in turn quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924))) (internal citation omitted). To establish predicate offenses under §§ 1341 or 1343, it is the scheme that must be fraudulent, not necessarily the particular mail or wire transmissions that constitute the offenses. *See Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345, 364 (3d Cir.2003). [ ] Finally, to establish a "pattern" of predicate acts, [the plaintiff] must allege that the acts are related, and amount to or pose a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *Tabas*, 47 F.3d at 1292.

*Kolar*, 361 F. App'x at 362-63 (internal footnote omitted).

Here, Plaintiffs have pled predicate acts that include alleged mail fraud, wire fraud, money laundering, and operating an unlicensed money transmitting business. Defendants object that Plaintiffs have not adequately pled that LES operated an "unlicensed money transmitting business" because they do not allege that LES charged fees strictly for executing money transfers, which Defendants argue is an essential element. Even if this is so, the Court does not view this objection as a basis for dismissing the RICO claim, because Plaintiffs have also alleged numerous acts of mail and wire fraud as part of the alleged "pattern of racketeering."

Defendants also insist that Plaintiffs have failed to plead the circumstances of the alleged fraud with sufficient particularity. *See* Federal Rule of Civil Procedure 9(b) ("In alleging fraud

or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Morales v. Superior Living Prods.,* 398 F. App'x 812, 814 (3d Cir. 2010) ("Because Appellants present a fraud-based RICO claim, they must plead with particularity the circumstances of the alleged fraud.") (citing *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004)).  To satisfy this pleading standard, plaintiffs must plead the "date, place or time" of the fraud, or must otherwise satisfy the particularity requirement through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Lum*, 361 F.3d at 224 (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)) (internal quotation marks omitted).  "Plaintiffs must also allege who made a misrepresentation to whom and the general content of the misrepresentation." *Id*.

Based on its thorough review of the SAC's 195 paragraphs and accompanying exhibits, the Court is satisfied that Plaintiffs have pled a fraudulent scheme with sufficient particularity. Plaintiffs allege that, after the ARS market froze in February 2008, the Defendants continued to refer clients to LES for §1031 exchange services while withholding material information about LES' dire financial condition and the fact that LES was operating a Ponzi scheme whereby the new customers' exchange funds were utilized (without their knowledge or permission) to close prior exchanges with pre-existing clients.  Insofar as Plaintiffs are personally concerned, the SAC alleges that Plaintiffs dealt with LTIC agents Watterson and Bentz in their 2008 exchange and, during this time, LTIC knew, but failed to disclose through its agents, that:  (i) LES was financially impaired; (ii) LES was operating a Ponzi scheme; and (iii) if Plaintiffs utilized LES as a QI, there was a substantial likelihood that their exchange funds would be lost and the exchange would fail.  (SAC ¶¶ 138-43.)  The SAC further alleges that LTIC, through Watterson, affirmatively misrepresented to Plaintiffs that their exchange funds would be, and subsequently

were, deposited into a discrete, segregated bank account for purposes of safe-keeping when, in fact they were commingled and lost. (*Id.* ¶¶ 12, 144-49.) In addition, the SAC alleges that LTIC provided fraudulent or misleading documents, including LES promotional materials as well as the Plaintiffs' exchange agreement, which LTIC's local agent helped Plaintiffs prepare, and which falsely promised that LES would safeguard the Plaintiffs' monies and fund the Plaintiffs' exchange. (*Id.* ¶¶ 7, 20-22, 38-48, 137.) Plaintiffs have appended to the complaint copies of both the fraudulent exchange agreement and fraudulent promotional materials. (SAC Exs. 2, 3, 4.) In this Court's estimation, the foregoing allegations and referenced exhibits inject sufficient "precision" and a sufficient enough "measure of substantiation" so as to satisfy Rule 9's heightened pleading standard and to place the Defendants "on notice of the precise misconduct with which [they are] charged." *Lum*, 361 F.3d at 223-24.

Defendants also argue that Plaintiffs failed to sufficiently plead predicate acts. The Court does not agree. Plaintiffs have alleged predicate acts of, among other things, mail and wire fraud, which involves merely the use of the mail or interstate wires for purposes of carrying out the fraudulent scheme. *See Kolar*, 361 F. App'x at 362 (citing *Lum*, 361 F.3d at 223). For purposes of establishing predicate offenses under §§ 1341 or 1343, it is the *scheme* that must be fraudulent, not necessarily the particular mail or wire transmissions that constitute the predicate offenses. *See Kolar,* 361 F. App'x at 362-63; *Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345, 364 (3d Cir. 2003). Plaintiffs have alleged multiple acts of wire or mail fraud both with respect to their own exchange and with respect to other 1031 exchanges. These allegedly included the use of frequent email, telephone and other communications between Plaintiffs, LTIC and LES during the course of Plaintiffs' failed exchange, the parties' exchange of numerous documents (including the interstate transmission of allegedly fraudulent marketing

material and exchange agreements to Plaintiffs), and the wiring of Plaintiffs' exchange funds to

LES. (*See* SAC ¶¶ 107-109, 158.) The Court finds that these allegations are sufficient to allege

a plausible "pattern" of racketeering. As Defendants have not challenged any other elements of

Plaintiffs' RICO claims under §§1962(c) or (d), Count 3 will not be dismissed at this stage.

## VI. CONCLUSION

Based upon the foregoing reasons, Defendants' motion for judgment on the pleadings

will be denied with respect to Count 3 of the SAC and granted as to all other claims. The denial

of Defendants' motion will be without prejudice to Defendants' right to renew their challenges to

the RICO count at a later juncture, if appropriate, with the benefit of discovery. An appropriate

order follows.

*s/ Nora Barry Fischer*

Nora Barry Fischer
United States District Judge

Date: May 27, 2015

cc: All counsel of record
(via CM/ECF)