**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOSEPH J. GERMINARO, an individual, and GABRIELLA P. GERMINARO, an individual, | ) ) ) | |
| | ) | Civil Action No. 14-1202 |
| Plaintiffs, | ) ) | Judge Nora Barry Fischer |
| v. | ) ) ) | |
| FIDELITY NATIONAL TITLE INSURANCE COMPANY, and COMMONWEALTH LAND TITLE INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

In this civil action, Joseph and Gabriella Germinaro ("Plaintiffs") have sued Defendants Fidelity National Title Insurance Company ("FNTIC"), as successor to Lawyers Title Insurance Corporation ("LTIC"),[1] and Commonwealth Land Title Insurance Company ("CLTIC") for alleged violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et seq.* ("RICO"). The suit arises out of Plaintiffs' unsuccessful attempt to effectuate a tax-deferred land exchange ("§1031 exchange") pursuant to Section 1031 of the Internal Revenue Code, 26 U.S.C. §1031.

---

[1] LTIC was merged into Fidelity National Title Insurance Company ("FNTIC") effective June 30, 2010, and FNTIC is the surviving company. (Stipulation to Amend Caption ¶3, Doc. No. 63.) Although reference to LTIC is made throughout this Memorandum Opinion, the case caption reflects the designation of FNTIC as the appropriate party-defendant in lieu of LTIC. (*See* Order dated Jan. 22, 2015, Doc. No. 64.)

In November 2008, as part of the §1031 exchange, Plaintiffs entrusted approximately $831,187 to LandAmerica 1031 Exchange Services, Inc. ("LES"), a "qualified intermediary" under the Internal Revenue Code. Approximately one week later, LES -- then a sister-corporation to LTIC and CLTIC -- filed for bankruptcy. As a result, Plaintiffs were unable to complete their §1031 exchange and sustained financial loss.

In this lawsuit, Plaintiffs allege that LTIC, CLTIC, and LES – together with their parent company, LandAmerica Financial Group, Inc. ("LFG") and various corporate officers – operated a Ponzi scheme as part of a RICO "enterprise." Plaintiffs aver that, as part of this scheme, LTIC and CLTIC induced the Plaintiffs to entrust their money to LES while making misrepresentations about and/or fraudulently concealing the fact that: (a) LES was on the brink of insolvency; (b) Plaintiffs' funds were being commingled with those of other LES customers; (c) Plaintiffs' funds were being used to complete the exchanges of LES' pre-existing customers; and (d) Plaintiffs were at substantial risk of losing their funds by placing them with LES. Plaintiffs further maintain that LTIC and CLTIC injected cash into LES for the purpose of allowing LES to make "lulling payments" and thereby perpetuated the Ponzi scheme.

Presently pending before the Court is the Defendants' Motion for Summary Judgment (Doc. No. 124) and the Plaintiffs' Motion for Partial Summary Judgment on the issue of liability (Doc. No. 119). For the reasons that follow, Defendants' motion will be granted and Plaintiffs' motion will be denied.

## II. FACTUAL BACKGROUND[2]

### A. IRC 1031's Allowance of Deferred Capital Gains

Section 1031(a) of the Internal Revenue Code provides that "No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."  26 U.S.C. §1031(a)(1). Under this provision, the seller of an investment property (*i.e.,* a "relinquished property") may defer his or her capital gains on the taxable proceeds of the sale ("exchange funds") if those funds are used to purchase a like-kind property (a "replacement property").  To qualify for this tax-deferred treatment, the property owner must identify the like-kind replacement property within 45 days of the sale of the relinquished property and must close on the purchase of the replacement property within 180 days from the sale of the relinquished property.  *Id*. at §1031(a)(3).

In order to obtain the tax deferral benefit provided by Section 1031, the property owner must not actually or constructively receive the proceeds of the sale of the relinquished property. *See* 26 C.F.R. §1.1031(k)-1(f).  The Internal Revenue Service has defined four "safe harbors" which will ensure a determination of non-receipt, *to wit*:  a "qualified escrow account," a "qualified trust," a "qualified intermediary," or certain security or guarantee arrangements.  *See id*. §1.1031(k)-1(g).  Under the U.S. Treasury's regulations, a "qualified intermediary" ("QI") is defined, in relevant part, as someone who:  "[e]nters into a written agreement with the taxpayer

---

[2] The factual evidence bearing on this case is set forth in the parties' extensive statements and counterstatements of facts, and responses and replies thereto.  (*See* Doc. Nos. 121, 126, 134, 135, 138, 139, 150, 151, 154, 155, 160, and 161.)  Because the Court is writing primarily for the parties, who are well-versed in the evidentiary record, the Court will summarize those facts that it perceives to be undisputed and relevant to its disposition of the pending motions.

(the "exchange agreement") and, as required by the exchange agreement, acquires the relinquished property from the taxpayer, transfers the relinquished property, acquires the replacement property, and transfers the replacement property to the taxpayer." 26 C.F.R. §1.1031(k)-1(g)(4)(iii)(B).

## B.  THE ALLEGED "ENTERPRISE" PARTICIPANTS

At times relevant to this lawsuit, LFG was a holding company that, along with certain of its subsidiaries, provided insurance and real estate services nationwide.  (P1.)[3]  LES was a subsidiary of LFG that provided services, including acting as a QI, for customers who desired to effectuate §1031 exchanges.  (P2.)  LTIC and CLTIC were Nebraska-regulated title insurers and subsidiaries of LFG that provided title insurance and related real estate services in numerous states.  (P3, P4.)

During times relevant to this lawsuit, LFG and its various subsidiaries had a number of interlocking officers and directors.  Prior to November 26, 2008, when LFG and LES filed for bankruptcy (P1, P2), Theodore Lindy Chandler, Jr. ("Chandler") served as Chief Executive Officer and Chairman of the Board of Directors for LFG, LTIC, and CLTIC.  (P6, P8, P9.)  G. William Evans ("Evans") served as the Chief Financial Officer for LFG, director for LES, and Senior Executive Vice President for LTIC and CLTIC.  (P6-P9.)  Michelle Gluck ("Gluck") was the General Counsel of LFG as well as Executive Vice President for LTIC and CLTIC. (P6, P8, P9.)   Ronald B. Ramos ("Ramos") was the Senior Vice President and Treasurer for LFG and provided financial oversight for LES.  (P7; Ramos Dep. at 14:12-25, Doc. No. 129-13.)  Pamela

---

[3] Citations to "P1" through "P244" refer to Plaintiffs' Concise Statement of Material Facts in Support of [Their] Motion for Partial Summary Judgment and the parties' respective responses, replies and sur-replies thereto, as collectively set forth in Docket No. 160.

Saylors ("Saylors") was an Executive Vice President for LTIC and CLTIC. (P8, P9.)  Peter A. Kolbe ("Kolbe") was the Senior Vice President and Government Affairs Counsel for LFG, LTIC and CLTIC.  (P6, P8, P9.)  Stephen Connor ("Connor") was the Chief Operations Officer and a director of LES.  (P7.)

### C. LES's Exchange Agreements

Prior to filing for bankruptcy in 2008, LES functioned as a QI that performed §1031 exchanges for customers across the country.  (P2.)  Defendants LTIC and CLTIC had a physical presence in larger cities across the country and would offer LES's marketing materials to its customers in those locations.  (P70.)

In the years preceding its bankruptcy, LES entered into thousands of exchange agreements with its customers (referred to at times as "exchangers"), a sample of which is included within Plaintiffs' appendix of exhibits.  (*See* Pls.' Ex. 58, Doc. Nos. 122-26 and 122-27, referred to hereafter as the "form exchange agreement" or "form agreement.")[4]   Under the terms of the form exchange agreement, LES agreed to acquire the relinquished property from the customer and convey the replacement property to the customer.  (Pls.' Ex. 58, Form Exchange Agreement ¶1(a).)  LES agreed to "hold" the exchange funds from the customer's sale of the relinquished property and "make payments from the [e]xchange [f]unds to acquire the [r]eplacement [p]roperty" on behalf of the customer. (Form Exchange Agreement ¶2(a) and (b).)  In the interim, LES would have "sole and exclusive possession, dominion, control and use of all [e]xchange [f]unds," including any interest earned thereon.  (*Id.*¶2(c).)  The customer would

---

[4] Defendants maintain that LES utilized various iterations of this agreement, and there was no singular static "form agreement" for all transactions; however, Plaintiffs' Exhibit 58 includes contractual language that appears to have been common to many, if not most, of the exchange agreements used by LES during the time period in question.

have "no right, title, or interest in or to the [e]xchange [f]unds or any earnings thereon" and "no right, power, or option to demand ... or otherwise obtain" same, during the pendency of the exchange period. (*Id.*)

Upon its receipt of the exchange funds, LES agreed to "deposit" the funds "in an account maintained at SunTrust Bank in Richmond, Virginia." (Form Exchange Agmt. ¶3(a).) LES guaranteed the customer a certain specified rate of interest on the funds deposited which, if not applied toward the purchase of the replacement property, would be paid to the customer at the end of the exchange period. (*Id.*) Pursuant to Paragraph 3(a) of the form agreement, the customer "acknowledge[d] and agree[d] that the amount of the [e]xchange [f]unds may be in excess of the maximum amount of deposit insurance carried by the depository institution indicated . . . ;" but regardless of this, "LES unconditionally guarantee[d] the return and availability of the [e]xchange [f]unds and the guaranteed interest rate stated" in the exchange agreement. (*Id.*)

Paragraphs 4(a)-(b) of the exchange agreement set forth the procedures by which LES's customers would identify their replacement properties. (Form Exchange Agmt. ¶4.) Paragraphs 5(a)-(b) set forth the terms under which LES would acquire the replacement property and transfer it to the customer. (*Id.* ¶5.)

LES's contractual duties were set forth in Paragraph 6 of the form agreement. Subparagraph 6(a) stated that "LES has entered into this [e]xchange [a]greement with the intention of being a 'qualified intermediary' within the meaning of [Treasury Regulation] Section 1.1031(k)-1(g)(4)(iii) . . . and shall use its best efforts to retain that status until all of the [e]xchange [f]unds have been disbursed in accordance with this [e]xchange [a]greement." (Form Exchange Agreement ¶6(a).) Subparagraph 6(b) reiterated that "LES is entering into this

[e]xchange [a]greement solely for the purpose of facilitating [the customer's] exchange of the [r]elinquished [p]roperty for the [r]eplacement [p]roperty." (*Id*. ¶6(b).) It acknowledged that the customer was executing the exchange agreement based on the advice of his or her legal and tax advisers. (*Id*.) Subparagraph 6(c) limited LES's duties and obligations under the agreement by providing:

> **LES** shall only be obligated to act as an intermediary in accordance with the terms and conditions of this [e]xchange [a]greement and shall not be bound by any other contract or agreement, whether or not **LES** has knowledge of any such contract or agreement or of its terms or conditions. **LES** has undertaken to perform only such duties as are expressly set forth herein, and no additional duties or obligations shall be implied hereunder or by operation of law or otherwise.

Paragraph 11 of the form exchange agreement set forth various miscellaneous provisions, including an integration clause acknowledging that "[t]his [e]xchange [a]greement contains the entire understanding between the parties hereto." (Form Exchange Agmt. ¶11.) It also made clear that the agreement could be "modified, altered, or amended only by the written agreement of all the parties." (*Id*.)

Based on the language of the form agreement, Plaintiffs contend that: (i) LES promised to deposit and "hold" the customer's exchange funds in its bank account at SunTrust Bank in Richmond until the funds were needed to purchase the customer's replacement property, and (ii) LES "unconditionally guaranteed" that, when needed, the exchange funds would be immediately available for purposes of acquiring the said replacement property.

### D. LES'S INVESTMENT IN AUCTION RATE SECURITIES

As a qualified intermediary, LES received the proceeds from the sales of its customers' relinquished properties. As a general practice, LES held these proceeds – or "exchange funds" -- in a commingled account at Sun Trust Bank in Richmond, Virginia (referred to hereafter as the

"commingled account" or "Account #3318").[5]  (Devon M. Jones Affid. ¶3, Doc. No. 136-14.)

Although exchangers could specifically request that LES place their funds into a segregated

account, LES's default procedure was to deposit exchange funds into its commingled account.

(P39, P40.)  Account #3318 was the principal account maintained by LES for its daily

operations.  (Jones Affid. ¶ 4.)  LES utilized the account to pay its operating expenses, pay

dividends to LFG, obtain replacement properties, or return exchange funds to customers whose

§1031 exchanges could not be completed.  (*Id.* ¶6.)

At all times relevant to this lawsuit, LFG's treasury department performed the treasury

functions of LES.  (Jones Affid. ¶2.)  Based on LES's liquidity needs, LFG's treasury

department determined, on a daily basis, whether to transfer funds out of Account #3318 and

place them into investment accounts or whether to redeem outstanding investments and deposit

investment proceeds into Account #3318.  (Jones Affid. ¶7.)  Any funds that were not transferred

from Account #3318 were automatically swept at the end of each business day to a money

market account which LES held at SunTrust Bank, because Account #3318 was a non-interest

bearing account.  (*Id.* ¶¶ 9-10.) LFG's treasury department routinely invested the funds from

Account #3318 in a number of investment vehicles in accordance with LFG's corporate

investment policy, including commercial paper, treasuries, and agency and corporate bonds.  (*Id.*

¶8.)

Beginning in or around 2002, LES, through LFG, began investing a portion of the

commingled exchange funds in Auction Rate Securities ("ARSs"), which were sold to LES by

Citigroup Global Markets, Inc. and SunTrust Robinson Humphrey, Inc. ("STRH"), a separate

---

[5] The account is so designated because the bank account number ended in "3318."

entity-affiliate of SunTrust Bank.[6]  (P47, P76; Pls.' Ex. 42, Doc. No. 122-20 at 6.)  The ARSs

that LES purchased consisted entirely of debt instruments backed by student loans, substantially

all of which were guaranteed by the U.S. government.  (*See* Pls.' Ex. 21, Doc. No. 122-5 at 6.)

The ARS investments were not FDIC-insured.  (P48.)

LES purchased the ARSs by transferring funds out of Account #3318 and into brokerage

accounts outside of SunTrust Bank.  Plaintiffs posit that the ARS purchases were financially

motivated in that LES earned income from the spread between its returns on the ARS

investments and the contractual rate of interest it paid to customers pursuant to the exchange

agreements.  (*See* P95; Pls.' Ex. 21, Doc. No. 122-5 at 6.)

### E.  THE ARS FREEZE AND LES'S ENSUING LIQUIDITY DEFICIT

In February 2008, the ARS market froze and the ARSs in which LES had invested

became illiquid.  An internal LandAmerica memorandum explained the situation as follows:

> as a result of liquidity issues in the global credit and capital markets, beginning in
> February 2008, the auctions for ARS started to "fail," meaning that there was not
> enough demand to sell all of the securities that holders desired to sell . . . [LES]
> will not be able to liquidate its ARS until the issuer calls the security, a successful
> action occurs, a buyer is found outside of the auction process, or the security
> matures.  [LES] has liquidity exposure to these securities to the extent that it
> would be required to utilize these securities to satisfy the purchase of properties.

(Pls.' Ex. 21, Doc. No. 122-5 at 7.)  Gerard McHale, Jr., who would eventually serve as LES's

Liquidation Trustee in bankruptcy, described the situation as a liquidity "crisis":

> In February of 2008, the student loan auction rate security market collapsed.  LES
> had been investing all of the escrow funds of the 1031 exchangers in student loan

---

[6] An ARS is a debt instrument with a long-term maturity for which the interest rate is regularly set through an
auction process that is typically held every 7, 14, 28 or 35 days.  (See Pls.' Ex. 5, Doc. No. 122-2 at 5.)  During the
auction process, bids with successively higher rates are accepted until all of the securities in the auction are sold.
The final rate at which all of the securities are sold is the "clearing rate."  That rate applies to all of the securities
until the next auction is held.  (*Id.*)

auction rate securities, [ARSs]. When the market froze, there was [a] liquidity crisis within LES.  Because of the nature of the 1031 exchange, LES would need funds within 180 days to close any pending 1031 transactions.  Having no ability to sell off the auction rate securities in which it invested, it operated from small amounts of funds that were on hand and also the funds that it was bringing in on a regular ... basis.

(P237 (citing McHale Dep. at 32:23-33:12).)  McHale confirmed that, following the freezing of the ARS market, LES had to use new, incoming exchange deposits to fund its older exchange obligations.  (P237 (citing McHale Dep. at 33:20-34:21).)

The financial figures bear out LES's liquidity problems.  As of March 31, 2008, LES held approximately $1.8 billion, some $290.5 million of which was invested in the now frozen ARSs.  (P54, P55.)  Throughout the remainder of 2008, the volume of new real estate transactions declined sharply, and fewer exchanges occurred.  As a result, the outflow of LES's exchange fund payments outpaced the inflow of new deposits, and the funds tied up in frozen ARSs became an ever larger percentage of LES's commingled exchange fund portfolio.  By April 29, 2008, LES's total exchange fund portfolio was down to $612 million, $290 million of which was still tied up in the frozen ARSs.  (P65.)  According to the minutes from LFG's Board of Directors meeting, the company did not view the illiquid ARSs as a "concern because the 1031 portfolio always has a base amount of money it is holding."  (P65.)  By September 2008, however, the total commingled fund portfolio was down to $318 million, $290.5 million of which consisted of the frozen ARSs.  (P96, P97.)  That same month, outflows from the commingled account exceeded inflows by approximately $83 million, leaving LES only $7.2 million in net assets.  (P98, P99, P102, P103.)

## F. LFG's Efforts to Resolve the Liquidity Deficit

Following the February 2008 ARS freeze, LFG's officers and directors explored a number of avenues for obtaining additional funds in an effort to remediate LES's liquidity deficit. To that end, LFG pursued cost-reduction measures and attempted to sell one of its subsidiary banks. (P89; D146.)[7] Between September 25 and October 17, 2008, LFG transferred a total of $65 million to LES to assist LES in meeting its obligations. (P91; D146.) LFG also requested a $35 million draw on an existing line of credit and attempted to obtain new lines of credit equal to the par value of the frozen ARSs. (D146.) In addition, LFG attempted to sell ARSs to third parties and also tried, unsuccessfully, to persuade the financial institutions that had sold LES the ARSs to buy back the securities or loan against them. (P106, D146; Pls.' Ex. 47, Doc. No. 122-20 at 6.) When those efforts failed, LFG explored the possibility of filing a legal action against those institutions for securities fraud. (D146; Kirpalani Dep. at 43:10-12, Doc. No. 145-56.) Beginning in October 2008, LFG coordinated a transfer of ARSs to LTIC and CLTIC in exchange for approximately $70 million in liquid assets. (Pls.' Ex. 43, Doc. No. 122-18 at 26, Doc. No. 122-19 at 2-3; *see also* P106, P112, P217, D146.) LFG also executed a merger agreement with Fidelity National Financial ("FNF"), which ultimately fell through when FNF withdrew from the merger on November 20, 2008. (D146, D147.) LFG sought assistance, unsuccessfully, from the Federal Reserve Bank in Richmond. (D146.) Finally, LFG's Chairman and CEO Chandler wrote to Treasury Secretary Henry M. Paulson, Jr. on October 20, 2008, to request that the U.S. Treasury Department provide TARP funds by either directly purchase the ARSs or lend against them; however, the request was denied. (P162-P165; D146.)

---

[7] Citations to "D1" through "D175" refer to Defendants' Concise Statement of Material Facts in Support of [Their] Motion for Summary Judgment and the parties' respective responses and replies thereto, as collectively set forth in Docket No. 151.

Throughout this period of time, LES continued to execute exchange agreements with new customers whose exchange funds were then utilized to satisfy LES's other outstanding obligations, including the funding of prior exchange agreements.  (P222.)  Plaintiffs contend that, in effect, LES -- with the assistance of LFG, the Defendants, and their overlapping officers and executives -- was operating a fraudulent "Ponzi scheme."  Plaintiffs insist that the exchange agreements were deceptive insofar as they failed to disclose that:  exchange funds would not be "held" at a bank for the customer's benefit; LES could not "guarantee" the availability of the exchange funds for purposes of completing the customer's intended §1031 transactions; and LES was in fact on the verge of a financial collapse.

Defendants contend that LFG's management acted in good faith at all times in an attempt to steer LES through an unprecedented global financial crisis and satisfy all of LES's §1031 exchange obligations.  Defendants deny that the post-ARS freeze transactions were fraudulent in any respect or that they were part of a "Ponzi scheme."  Defendants maintain that, up until November 20, 2008 when FNF withdrew from the announced merger agreement, LFG's management felt confident that LES could continue to meet its customer obligations as they became due.

In either case, it is undisputed that LFG's efforts to resolve LES's liquidity deficit were unsuccessful and, by late November 2008, LES could no longer continue its activities as a QI. On November 24, 2008, LES ceased operations.  (D2.)  Two days later, LES and LFG filed voluntary Chapter 11 petitions.  (P1, P2.)

### G.  PLAINTIFFS' ATTEMPT TO EFFECTUATE A §1031 EXCHANGE

Meanwhile, in October 2008, Plaintiffs were interested in effectuating a §1031 exchange in connection with their anticipated sale of an investment property located in Pittsburgh.

Plaintiffs had previously transacted a §1031 exchange in 2002-2003, utilizing the services of LTIC and LES's predecessor company. (*See* Decl. of Joseph Germinaro at ¶1, Doc. No. 143, and Exhibits 1(a)-(e) thereto.) Plaintiffs chose LES to serve as the QI for their 2008 transaction based, in part, on LES's solid reputation and based partly on Plaintiffs' prior dealings with LES's predecessor company and with Alfred Watterson, an attorney employed by LTIC. (P480.)[8]

On October 22, 2008, Plaintiffs executed an exchange agreement with LES. (Pls.' Ex. 113, Doc. No. 122-37 at 11-20.) In virtually all respects, the provisions of Plaintiffs' exchange agreement mirrored those of the form exchange agreement discussed above. One exception pertains to Paragraph 3(a) of Plaintiffs' exchange agreement, which stated:

> **Taxpayer** will receive interest on the Exchange Funds at an annualized rate equal to 100% of the intended Federal Funds Rate as announced by the Federal Open Market Committee less seventy five basis points (-75 bps), compounded daily, adjusting as the Federal Funds Rate does, one day following the same, during the Exchange Period (the "Growth Factor") from the first business day following **LES'** receipt of funds via wire transfer to the **LES** account in Richmond, Virginia that it maintains at SunTrust Bank for the purpose of collecting taxpayers' exchange funds ... to the day of withdrawal. **LES** and **Taxpayer** agree that the Growth Factor, if not applied to the acquisition of the Replacement Property identified by **Taxpayer** ..., shall be paid to **Taxpayer** after the Termination Date. **LES** unconditionally guarantees the return and availability of the Exchange Funds and the guaranteed interest rate stated above.

(Pls.' Ex. 113, Pls.' Exchange Agreement ¶3(a), Doc. No. 122-37 at 13.) Absent from Plaintiffs' agreement was the statement (present in the form exchange agreement): "Taxpayer acknowledges and agrees that the amount of the Exchange Funds may be in excess of the maximum amount of deposit insurance carried by the depository institution indicated above . . .." (*Id.*)

---

[8] Citations to "P245" through "P483" refer to Plaintiffs' Concise Statement of Additional Material Facts in Support of [Their] Motion for Partial Summary Judgment and the Defendants' reponses thereto, as collectively set forth in Docket No. 150.

On November 17, 2008, Plaintiffs closed the sale on their relinquished property. (P219, P221; Pls.' Ex. 21, Doc. No. 122-37 at 24-27.) The sale yielded proceeds of approximately $831,187, which were wired by LTIC to LES the following day. (P219, P221; Pls.' Ex. 111, Doc. No. 122-37 at 9.) Based on prior conversations with Watterson and an LES agent, Plaintiff Joseph Germinaro understood that LES would be placing the funds into a segregated account with its own account number. (P412-P415.)

On November 24, 2008, one week after the closing on their relinquished property, Plaintiffs were notified that LES was immediately terminating its operations. (D59.) Prior to receiving this notice, Plaintiffs had been unaware of LES's liquidity problems. Plaintiffs were also unaware that their funds had been deposited into LES's commingled account and that the funds could be used to satisfy LES's prior exchange obligations. (P480.) As a result of LES's cessation of business operations, Plaintiffs were unable to complete their §1031 exchange transaction, and their 180-day exchange period lapsed on May 16, 2009.

## H. LFG's and LES's Bankruptcy Proceedings

LFG and LES filed their respective Chapter 11 petitions in the United States Bankruptcy Court for the Eastern District of Virginia on November 26, 2008. (P1, P2.) Contemporaneously therewith, FNTIC and Chicago Title Insurance Company agreed to acquire the stock of LTIC and CLTIC, respectively. (D5.) The bankruptcy court later approved this sale, which yielded proceeds of $135 million in cash, a $50 million promissory note, and $50 million in FNF stock to the bankruptcy estate of LFG. (D6, D7.)

On December 30, 2008, Plaintiffs filed an adversary proceeding against LES in the Bankruptcy Court in which they sought: (i) the return of the 1031 exchange funds from their November 2008 transaction; (ii) consequential damages, and (iii) punitive damages for fraud-

based claims. (D13, D65.) Subsequent to the bankruptcy petition date, over 85 adversary proceedings were filed by §1031 exchange customers of LES who sought the return of exchange funds on the grounds that the funds were not property of LES's bankruptcy estate. *See In re LandAmerica Fin. Grp., Inc.*, No. 08-35994, 2013 WL 3731757, at *2 (Bankr. E.D. Va. July 15, 2013).

Because of the large number of adversary proceedings filed against LES, the bankruptcy court issued a protocol order staying the litigation in all but five lead cases, which were selected to proceed on an expedited basis because they presented factual and legal issues common to other adversary proceedings. *In re LandAmerica Fin. Grp.,* 2013 WL 3731757, at *2. Two of the lead cases involved exchangers who had signed what the bankruptcy court referred to as "Segregated Account Agreements" – i.e., exchange agreements that included language contemplating the placement of the customer's exchange funds into a separate account or sub-account associated with the customer's name. *Id.* The other three lead cases involved customers who had signed what the bankruptcy court referred to as "Commingled Account Agreements – *i.e.,* exchange agreements that, like Plaintiffs' agreement, did not specifically include the "segregation" language. *Id.*

Following expedited proceedings, the bankruptcy court issued two separate decisions addressing whether, under the terms of each type of exchange agreement, the exchange funds and other consideration that had been delivered to LES for purposes of facilitating §1031 exchanges were property of LES's bankruptcy estate or were monies held in trust for the benefit of LES's customers. On April 15, 2009, the bankruptcy court ruled that funds deposited into segregated accounts of LES at SunTrust Bank were property of LES's bankruptcy estate, not property of LES's customers. *Millard Refrig. Servs., Inc. v. LandAmerica 1031 Exch. Servs.,*

*Inc. (In re LandAmerica Fin. Group, Inc.),* 412 B.R. 800, 802 (Bankr. E.D. Va. 2009) (hereafter, "*Millard Refrigerated Services, Inc.*"). On May 7, 2009, the bankruptcy court issued a similar ruling, holding that funds in LES's commingled account at Account #3318 were property of the estate, and not property of LES's customers. *See Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exch. Servs., Inc. (In re LandAmerica Fin. Group, Inc.),* No. 08-35994, 2009 WL 1269578, at *1 (Bankr. E.D. Va. May 7, 2009) (hereafter, "*Frontier Pepper's Ferry*").

The five test cases were ultimately resolved through mediation; and the mediated settlement agreement ultimately served as the framework for the formulation of a consensual Chapter 11 plan. *See In re LandAmerica Fin. Grp.,* 2013 WL 3731757, at *2. On November 23, 2009, the Court entered an Order confirming the Joint Chapter 11 Plan of the Initial Debtors, as well as certain LFG Affiliates (the "Plan"). *Id.* The Plan became effective on December 7, 2009. *Id.*

On April 3, 2009, Plaintiffs filed a proof of claim in which they sought, among other things, lost exchange deposits in the amount of $831,187.27, capital gains tax, lost profits from their failed exchange, and attorney's fees. (D29.) The portion of Plaintiffs' proof of claim consisting of exchange deposits was considered a "Class 6 claim" and was allowed in the full amount of $831,187.27. (D37.)

In December 2009, Plaintiffs received an initial distribution of their Class 6 claim in the amount of $199,809.66. (D38.) Subsequently, on or around June 1, 2010, Plaintiffs executed an "Assignment of Claim," pursuant to which they received $257,335.58 from Liquidity Solutions, Inc. in exchange for an assignment of the remainder of their Class 6 claim. (D39.) All Class 6 claims were intended to be paid at 100 percent regardless of what source the funds came from, and Plaintiffs acknowledge that they or their assignee would have recovered 100 percent of the

16

allowed amount of their Class 6 claim if they had accepted their share of the settlement funds from a related class action rather than opting out of the settlement.[9] (D41.)

On July 12, 2013, Plaintiffs submitted a "Class 7" damages claim form seeking an additional $234,507 in damages. (D49.) The bankruptcy court allowed this claim and, to date, Plaintiffs have recovered distributions on this claim totaling $157,000. (D50, D51.) However, Plaintiffs, like other exchangers, were unable to recover the portion of their claim that related to the lost investment opportunity on their intended replacement property. *See In re LandAmerica Fin. Grp.,* 2013 WL 3731757, at *7.

## I. THE INSTANT LITIGATION

On February 6, 2014, Plaintiffs commenced this action by filing a complaint in the Los Angeles Superior Court. After the case was removed to federal court, Plaintiffs filed their Second Amended Complaint ("SAC," Doc. No. 12), which remains the operative pleading in this matter. The SAC asserted eleven causes of action, including claims for fraud (Count 2), aiding and abetting fraud (Count 1), RICO (Count 3), breach of fiduciary duty (Count 4), aiding and abetting breach of fiduciary duty (Count 5), conversion (Count 6), aiding and abetting conversion (Count 7), intentional interference with a contract (Count 8), breach of implied covenant of good faith and fair dealing (Count 9), breach of contract (Count 10), and negligence (Count 11). Plaintiffs seek damage for, among other things, their lost investment opportunity relative to their intended replacement property. (SAC ¶162.)

By order dated September 4, 2014, the case was transferred from the United States District Court for the Central District of California to this judicial district. (Doc. No. 29).

---

[9] The aforementioned class action was commenced in the U.S. District Court for the Northern District of California under the caption *Hays, et al. v. Commonwealth Land Title Ins. Co., et al.*, No. 10–5336 (N.D. Cal.).

On December 5, 2014, Defendants filed a motion for judgment on the pleadings (Doc. No. 49). The Court subsequently granted the motion with respect to all counts in the SAC except for the RICO claims at Count 3. (Doc. Nos. 85 and 86.) Accordingly, Plaintiffs' RICO claims are the only causes of action that remain pending in this case.

On May 13, 2016, the parties filed their cross-motions for summary judgment relative to the RICO claims (Doc. Nos. 119, 124). Plaintiffs seek partial summary judgment as to liability only, while Defendants request judgment as to all aspects of the claims. The parties have submitted extensive briefing and evidentiary materials in relation to the pending motions. (*See generally* Doc. Nos. 120-123, 125-162.) In addition, the Court heard oral argument on July 12, 2016. As a result of the foregoing, the relevant issues are sufficiently joined and the motions are ripe for disposition.

### III. STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir.2013) (citation omitted). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. *See Montone v. City of Jersey City*, 709 F.3d 181 (3d Cir.2013). Rather, the Court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id*. In evaluating the evidence, the Court must

interpret the facts in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

## IV. DISCUSSION

In Count 3 of the Second Amended Complaint, Plaintiffs allege that the Defendants violated Sections 1962(c) and 1962(d) of RICO. These provisions state:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C.A. § 1962(c) and (d).

Plaintiffs request that this Court enter partial summary judgment in their favor by determining that the Defendants are liable under both of these RICO provisions as a matter of law. Defendants have filed a cross-motion for summary judgment, arguing that both claims fail in their entirety. We address each RICO claim seriatim.

### A. PLAINTIFFS' §1962(C) CLAIM

In order to succeed on a claim under §1962(c), the plaintiff must demonstrate: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lum v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir. 2004) (citing *Sedima v. Imrex Co.,* 473 U.S. 479, 496 (1985)). In addition, in order to have standing, the RICO plaintiff must show that he was "injured in his business or property by reason of a violation of § 1962." 18 U.S.C. § 1964(c).

Defendants argue that Plaintiffs have failed to establish a single element of their §1962(c) claim. Defendants further contend that Plaintiffs' RICO claims are barred by the applicable

statute of limitations, by an injunction that was entered in connection with the underlying bankruptcy proceedings, and by principles of *res judicata.*

While Defendants challenge every element of Plaintiffs' §1962(c) claim, the Court will narrow its analysis to the alleged "pattern of racketeering." Having considered the evidence in the light most favorable to Plaintiffs, this Court concludes that no reasonable jury could find that the Defendants engaged in the requisite "pattern of racketeering."

Under RICO, a "pattern of racketeering activity" is statutorily defined as at least two acts of racketeering activity within a ten-year period. 18 U.S.C. §1961(5). "Racketeering activity" includes predicate acts of federal mail fraud and wire fraud, as well as a host of other crimes, such as kidnapping, bribery, extortion, and dealing in controlled substances. *See id.* §1961(1). "To plead a pattern of racketeering activity, [Plaintiffs] must aver not only that each defendant committed at least two acts of prohibited racketeering activity but also that the predicate acts are related and that they amount to or pose a threat of continued criminal activity." *Hollis–Arrington v. PHH Mortg. Corp.*, No. 05–5051, 2006 WL 3078935, at * 4 (3d Cir. Oct. 26, 2006) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)). Predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240. "Continuity" refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. "Closed-ended continuity" can be established "by proving a series of related predicates extending over a substantial period of time." *Id.* at 242. A finding of "open-ended continuity," on the other hand, "depends on whether the threat of continuity is demonstrated." *Id.* (emphasis

in original). "It is, in either case, centrally a temporal concept." *Id.* at 241–42*; see also Hindes*

*v. Castle*, 937 F.2d 868, 873 (3d Cir.1991) ("[D]uration is the sine qua non of continuity.").

In this case, the alleged racketeering activity is properly characterized as a closed-ended

scheme. This Court previously summarized Plaintiffs' RICO allegations as follows:

> In Count 3 of the SAC, Plaintiffs allege that the Defendants violated RICO, 18
> U.S.C. § 1962(c) and (d), by participating in a 1031 Ponzi scheme that lasted from
> February 2008, when the ARS market froze, until November 26, 2008, when LES
> and LFG filed for bankruptcy protection. (SAC ¶¶ 153–162.) According to the
> SAC, "[t]he scheme and conspiracy was to run a 1031 Ponzi scheme at LES long
> enough for the ARS Freeze to thaw or for the enterprise to obtain capital from
> other sources to recharge the trust." (Id. ¶ 153.) This "required time and time
> could be obtained only by stealing other people's money to fund older Exchanges
> which [LES] could not fund because these LES customers' Exchange Funds were
> invested in the frozen ARS." (Id.) Plaintiffs allege that "CLTIC and LTIC assisted
> LES in misappropriating LES's clients' Exchange Funds with false promises and
> false LES solicitation materials to keep LES in business because the failure of
> LES would destroy the good will of CLTIC, LTIC and the LandAmerica brand."
> (Id. ¶ 154.) "The success of the scheme was dependent upon the ability to mislead
> clients regarding the safekeeping and use of the clients' Exchange Funds (or
> clients would not do business with LES) and to hide the ever-worsening financial
> condition of LES and LFG." (Id. ¶ 155.) Plaintiffs entered into their exchange
> agreement with LES on or around October 22, 2008 and, pursuant to that
> agreement, had their exchange funds wired to LES on or about November 21,
> 2008. (Id. ¶ 12.) Plaintiffs claim that their failed 1031 exchange was "the
> penultimate exchange LES engaged in prior to its Bankruptcy filing" on
> November 26, 2008. (Id. ¶¶ 12, 120.)

*Germinaro v. Fid. Nat. Title Ins. Co.*, 107 F. Supp. 3d 439, 450–51 (W.D. Pa. 2015).

Defendants now move for summary judgment on the grounds that Plaintiffs have failed to

demonstrate a pattern of racketeering that amounts to "continued criminal activity." According

to the Defendants, the SAC alleges a closed-ended RICO scheme that is too short in duration to

establish the requisite "continuity." This Court agrees.

A plaintiff may establish closed-ended continuity by proving that the related predicate

acts extended over "a substantial period of time." *H.J. Inc.*, 492 U.S. at 242; *see also*

*Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*, 87 F. App'x 227, 232 (3d Cir.

2003) ("For closed-ended continuity, a RICO plaintiff must allege a series of related predicates lasting a substantial period of time.") (internal citation and quotation marks omitted). "'A short term scheme threatening no future criminal activity will not suffice.'" *Ricale Assoc., LLC v. McGregor*, No. CV 15-541, 2015 WL 5781063, at *6 (D.N.J. Sept. 30, 2015) (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1412 (3d Cir.1991)).

To that end, federal courts within this circuit have consistently held that a pattern of alleged racketeering lasting less than one year does not, as a matter of law, constitute a "substantial period of time." *See e.g., Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) ("We hold that twelve months is not a substantial period of time."). *Accord Battiste v. Arbors Mgmt., Inc.*, 522 F. App'x 171, 173 (3d Cir. 2013)(alleged conduct occurring over a ten-month period was insufficient to establish a close-ended scheme; "ten months is too short a period to constitute a 'substantial period of time'"); *Tabas v. Tabas*, 47 F.3d 1280, 1293 (3d Cir.1995) ("Since *HJ Inc.*, this court has faced the question of continued racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for close-ended continuity."); *Hindes v. Castle*, 937 F.2d 868, 875 (3d Cir.1991) (eight month period of predicate acts without a threat of future criminal conduct does not satisfy continuity requirement); *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d at 1413 (same); *Banks v. Wolk*, 918 F.2d 418, 422–23 (3d Cir.1990) (same; fraudulent conduct lasting eight months was insufficient to form a pattern of racketeering activity); *Yucaipa Am. All. Fund I, L.P. v. Ehrlich*, No. CV 15-373 (SLR), 2016 WL 4582519, at *11 (D. Del. Sept. 2, 2016) ("Having alleged a pattern of racketeering activity lasting only nine months, the complaint does not satisfy close-ended continuity as a matter of law."); *Hawk Mountain LLC v. Mirra*, No. CV 13-2083, 2016 WL 3182778, at *20 (D. Del. June 3, 2016) (alleged pattern of racketeering activity based on a

series of letters sent between April and October 2010 failed to establish "continuity"), report and recommendation adopted, No. CV 13-2083-SLR/SRF, 2016 WL 4541032 (D. Del. Aug. 31, 2016); *Helman v. Murry's Steaks, Inc.*, 742 F. Supp. 860, 882 (D.Del.1990) (predicate acts spanning twelve months did not satisfy closed-ended continuity requirement).

As Defendants point out, the RICO conspiracy as alleged in Plaintiff's SAC consists of a 9-month period that lasted from the time of the ARS freeze in February 2008 to November 26, 2008, when LES and LFG filed for bankruptcy. Under the law of this circuit, "continuity" of the alleged criminal activity is lacking, and Plaintiffs' RICO claim fails as a matter of law.

1.     Conduct Predating the Alleged Ponzi Scheme

Despite this, Plaintiffs now argue that they have shown "continuity" because enterprise members fraudulently misused exchange funds for a period of at least six years prior to the ARS market freeze and engaged in thousands of predicate acts of mail fraud and/or wire fraud in the process. Plaintiffs assert that, from at least 2002 to February 2008, the enterprise members engaged in a scheme – i.e., an "ARS fraud" -- whereby LES falsely promised to "hold" exchange funds in its SunTrust Bank account until the funds were "withdrawn" to purchase replacement properties. Plaintiffs claim that, in "direct breach of the promise," (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 4, Doc. No. 140 at 9), enterprise members "withdrew Exchange Funds from the bank, transferred that money to securities brokers and placed it at risk in ARS[s] to increase profits for members, not the Exchangers who received the same nominal rate of interest stated in the Exchange Agreement no matter where their money was placed." (*Id*.) Plaintiffs posit that each wire transfer of funds constituted a "predicate act" of wire fraud that furthered the enterprise members' "scheme to misuse Exchange Funds to create improper profits." (*Id*. at 6, Doc. No. 140 at 11.)

23

This line of argument is unavailing. First, as Defendants point out, Plaintiffs' theory is at odds with the RICO scheme that was alleged in the SAC. Notably, the SAC is replete with references to the 9-month period between February 11, 2008 and November 26, 2008 – the time frame that encompassed both the alleged RICO scheme and the relevant "pattern of racketeering." (*See, e.g.*, SAC ¶¶ 1, 7, 8, 20-24, 70, 74, 95, 96, 131, 153, and 158.) This is consistent with Plaintiffs' RICO Case Statement, which also asserted that the basis of their claim was a 9-month "Ponzi scheme" that occurred between February 11 and November 26, 2008. (*See* Doc. No. 46 at 3, 5, 8-11, 12, 17, 19, 20, 22, 25.) In fact, in their own motion for summary judgment asserting RICO liability, Plaintiffs argued that the relevant "pattern of racketeering" was the various acts of mail and wire fraud that allegedly occurred during the course of the 9-month "Ponzi scheme." (*See* Pls.' Br. Supp. Mot. Summ. J. at 41-44, Doc. No. 120 at 48-51.) In essence, Plaintiffs are now alleging a different RICO scheme and pattern of racketeering than was pled in their SAC, but the time for amending pleadings has long since passed (*see* Doc. No. 62 ¶ 8), and "[P]laintiff[s] may not amend [their] complaint through arguments in [their] brief in opposition to a motion for summary judgment." *Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. Apr. 23, 2008) (internal quotation marks omitted).

In any event, even if the Plaintiffs' argument is taken at face value, it fails on the merits because the record does not evidence a pattern of racketeering during the six-year period that predated the freezing of the ARS market. In order to demonstrate predicate acts of mail fraud or wire fraud, Plaintiffs must show that mail or wire transmissions were utilized in furtherance of a scheme or artifice to defraud. *See Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, CIVIL ACTION No. 2:15-cv-3435, 2016 WL 7475816, at *11 (E.D. Pa. Dec. 29, 2016) (discussing mail fraud) (quoting *United States v. Pharis*, 298 F.3d 228, 233-34 (3d Cir. 2002)); *id.* at *12

(discussing wire fraud) (quoting *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012)).

"The scheme need not involve affirmative misrepresentation, ... but the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)) (internal citations omitted).

Here, the record does not support the existence of any fraudulent scheme or artifice in the years predating the ARS market freeze. Plaintiffs argue that exchangers were "defrauded" by LES's decision to move exchange funds out of its SunTrust account and into brokerage accounts for purposes of investing in ARS. To support this theory, they point to Paragraphs 2(a) and 3(a) of the form exchange agreement, wherein LES agreed, respectively, to "hold and apply the Exchange Funds" and "deposit the Exchange Funds in an account maintained at SunTrust Bank in Richmond, Virginia. . . ." (Form Exchange Agmt. ¶¶ 2(a) and 3(a), Doc. No. 122-26.) Notably, however, Paragraph 2(a) sets forth LES's agreement to "hold and apply the Exchange Funds in accordance with the terms and conditions of this Exchange Agreement." (Form Exchange Agmt. ¶2(a).) Pursuant to those terms and conditions, LES's customers divested themselves of all legal and equitable rights in the exchange funds, and LES – by contrast – exercised "sole and exclusive possession, dominion, control and use" of the funds. (Form Exchange Agmt. ¶2(c). As the bankruptcy court explained in *Frontier Pepper's Ferry*,

> The Exchange Agreements did not ... restrict LES' use of the funds. Rather, LES was vested with all legally-cognizable indicia of ownership. LES was given sole and exclusive possession, dominion, control and use of the Exchange Funds. *LES bore the risk of any bad investments it made and was free to use the funds to operate its business activities without any limitations whatsoever.*

2009 WL 1269578, at *11 (emphasis supplied). *See also Millard Refrig. Servs., Inc.*, 412 B.R. 800, 811 n.19 (Bankr. E.D. Va. 2009) (noting, with respect to §1031 transactions involving

segregated exchange funds, that "[n]othing in the Exchange Agreements...prohibited LES from

investing the Exchange Funds that were placed into the Segregated Accounts..., from transferring

the Exchange Funds out of the Segregated Accounts for its own use, or from otherwise obtaining

the benefits of the Exchange Funds.").

To buttress their "ARS fraud" theory, Plaintiffs point to an October 15, 2008 email that

was sent to Richard G. Mason of LFG from Douglas K. Mayer, an attorney with Wachtell Lipton

Rosen & Katz, who was acting as LFG's outside counsel, concerning the "Landamerica

Exchange Agreement." (Pls.' Ex. 222, Doc. No. 122-46 at 10.) Mayer appears to have sent the

email in response to an inquiry as to whether, under the terms of their exchange agreements,

LES's customers could be given frozen ARSs in the event that LES was unable to fund its §1031

obligations. Mayer replied:

> I looked at this, and don't see any basis to give investors auction rate notes rather
> than cash. On the contrary, as you probably noted already, the implication
> (though admittedly not the express words) of the language in section 3(a) is that
> the funds will be deposited in a bank account at SunTrust and kept there, not in
> some other kind of non-bank investment "account" at SunTrust or Citi, otherwise
> why would the section talk about deposit insurance limits? Also, and again as
> you doubtless saw, the unconditional guarantee of the "return and availability" of
> the Exchange Funds is quite bad for the client.

(Pls.' Ex. 222.)

Viewed in context, this email adds little probative support to Plaintiff's theory that

Defendants were complicit in a widespread fraudulent scheme, prior to February 2008, to

deceive LES's investors regarding the investment of exchange funds in ARSs. At bottom,

Mayer's assessment of the exchange agreements concerned the narrow question of whether --

after the ARS market had already frozen in February 2008 -- LES could discharge its contractual

obligation by providing clients with ARSs of questionable value rather than by making cash

payments toward the acquisition of the customers' replacement properties. Mayer did not

purport to opine on whether LES (or the other alleged enterprise members) had committed fraud by virtue of investing exchange funds in ARSs; in fact, he acknowledged that there was no express language prohibiting the movement of exchange funds out of LES's commingled, general operating account and into investment accounts elsewhere. To the extent Mayer believed that the contractual language implied otherwise, his personal interpretation of the contractual language is at odds with the bankruptcy court's well-reasoned decisions in *Frontier Pepper's Ferry* and *Millard Refrigerator Services*, which effectively foreclose Plaintiff's "ARS fraud" argument. To reiterate, the bankruptcy court found in those cases that the language in the form exchange agreements objectively and unambiguously gave LES exclusive control over the exchange funds and "the unrestricted right to use those funds as it saw fit." *Frontier Pepper's Ferry*, 2009 WL 1269578, at *11; *see also Millard Refrig. Servs*., 412 B.R. at 811 n.19 (finding similar objective intent with respect to exchange agreements governing segregated exchange funds). The bankruptcy court's interpretation of the exchange agreements in this regard was consistent with the general rule that:

> If there is an understanding between the parties that the person to whom funds are transferred is to pay "interest" thereon (at a fixed or current rate, and not merely such interest or other earnings as the funds, being invested, may earn), it becomes close to certain that the relationship is a debt rather than a trust. Interest is normally paid for the "use of funds." Accordingly, recipients of funds who pay interest are, in the absence of a definite understanding to the contrary, borrowers who are entitled to use the funds for their own purposes.

Restatement (Third) of Trusts §5(i) cmt. k (2003) (emphasis supplied). LES's unambiguous contractual right to use exchange funds for its own purposes is fundamentally at odds with the notion that LES, through "fraudulent" language in the exchange agreements, promised never to do so. *See Meridian Mort. Corp. v. Spivak,* No. CIV. A 91-3932, 1993 WL 193364, at *4 (E.D. Pa. June 7, 1993) ("It is, of course, not fraudulent or unlawful to agree or "scheme" to do

something which the law allows."), *aff'd sub nom. Meridian Mortg. Corp. v. Spivak,* 22 F.3d 302 (3d Cir. 1994).

Notably, Plaintiffs do not dispute that their "ARS fraud" theory runs counter to the bankruptcy court's rulings. Instead, they urge this Court to disregard the decisions in *Frontier Pepper's Ferry* and *Millard Refrigerated Services* on the theory that those decisions were procured through a "fraud" that Gluck personally orchestrated on the bankruptcy court. In support of this charge, Plaintiffs refer this Court to the deposition testimony of Susheel Kirpalani, Esq., a lawyer with the firm Quinn Emanuel Urquhart & Sullivan, LLP, who specializes in the restructuring of troubled companies. In late October 2008, LFG retained Quinn Emanuel for the purpose of assessing whether LFG or LES might have a case against Citigroup or SunTrust for securities fraud, based on the banks' involvement in selling ARSs to LES. Kirpalani testified that, in the course of his consultation with Gluck, Gluck indicated that LES's intent was to hold its customers' exchange funds in trust; moreover, Gluck and Kirpalani discussed making changes to the exchange agreement language that would clarify LES's intent. (*See* P348.) Subsequently, however, in connection with LES's bankruptcy proceedings, Gluck retained counsel from the law firm McguireWoods LLP to represent LES in the bankruptcy court test cases, including *Frontier Pepper's Ferry* and *Millard Refrigerated Services*. (P209.) In the course of those adversary proceedings, LES's bankruptcy counsel argued that the exchange agreements did not create a trustee-beneficiary relationship and that LES had never acted, or intended to act, as a trustee with respect to the exchange funds. (*See* P247, P248, P252, P261.)

Plaintiffs insist that this "Gluck-approved misrepresentation caused the bankruptcy court to incorrectly conclude that LES did not intend to hold funds in trust, which was what Gluck and her co-conspirators wanted." (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 20, Doc. No. 140 at 25.)

Plaintiffs further posit that, "[h]ad Gluck or LES presented [the bankruptcy judge] with a true and correct record of what LES actually intended, if the test case [p]laintiffs had been able to depose Quinn Emanuel, if Gluck had presented the bankruptcy court with any of the important letters ... admitting LES intended to and actually did hold [e]xchange [f]unds in trust, or if the Court had been presented with the [Federation of Exchange Accommodators] Code of Ethics binding each FEA member (including LES) to act as a fiduciary with respect to the [e]xchangers ..., the Bankruptcy Court would never have ruled that 'LES did not intend to serve as a trustee.'" (*Id.* at 21, Doc. No. 140 at 26.)

Plaintiffs' argument is unpersuasive. As is clear from the bankruptcy court's rulings in both *Frontier Pepper's Ferry* and *Millard Refrigerated Services*, the court discerned the contractual intent of the parties based solely on the objective, unambiguous language of the form exchange agreements. *See Frontier Pepper's Ferry*, 2009 WL 1269578, at *10 ("The Exchange Agreements provide that LES was acting in the narrow capacity of an exchange facilitator. . . . The unambiguous language of the Exchange Agreements makes clear that LES and Plaintiffs intended their relationships to be relationships of contract obligor and obligee."); *Millard Refrig. Servs.*, 412 B.R. at 813 (same). Furthermore, because the exchange agreements were integrated, the "[p]laintiffs therefore [could not] utilize extrinsic evidence to modify or alter the contracts' plain statements (i) that [p]laintiffs had no interest, including any equitable interest, in or to the Exchange Funds and (ii) that LES owed to [p]laintiffs no duty, including any fiduciary duty, not expressly set forth in the Exchange Agreements." *Frontier Pepper's Ferry*, 2009 WL 1269578, at *10 (citing law); *Millard Refrig. Servs.*, 412 B.R. at 813 (same). Thus, any evidence concerning LES's subjective intent to hold funds in trust was irrelevant to the bankruptcy court's rulings in the five test cases, because "[t]he objective language of the Exchange Agreements

preclude[d] consideration of any subjective belief that the parties may have had regarding the relationship between them." *Frontier Pepper's Ferry*, 2009 WL 1269578, at *10 (citation omitted); see also *Millard Refrig. Servs.*, 412 B.R. at 813 (holding the same).

Apart from being wholly speculative, Plaintiffs' suggestion that the bankruptcy court would have found trust intent on the part of LES is beside the point. What matters for purposes of establishing fraud is not what LES secretly intended, but what it *actually represented*. The "fraudulent" representation that LES allegedly made to its customers (i.e., that it would "hold" exchange funds in an FDIC-insured bank account) is derived from the language of the exchange agreements themselves. The bankruptcy court has already determined that the language in question contained no promise that LES would not invest or otherwise "use" the exchangers' funds after they were deposited into the commingled account at SunTrust Bank. Had the plaintiffs in the test cases demonstrated a mutual mistake on the part of LES and its customers concerning LES's trust intent, it is *theoretically* possible that the bankruptcy court could have reformed the exchange agreements to interpret them in accordance with the parties' true intent. But even if this Court indulges in such speculation, it would not change the bankruptcy court's determination about what the documents *actually said*. The bankruptcy judge interpreted the various exchange agreements in accordance with the parties' agreed choice of law (i.e., the law of Virginia) and found that the agreements objectively *and unambiguously* manifested an intention to allow LES to use the exchange funds, or invest them, as LES saw fit. The court's ruling in this regard stands, and Plaintiffs have demonstrated no persuasive basis for disregarding it. If anything, Kirpalani's testimony supports the bankruptcy court's conclusion that the exchange agreements, as written, did not objectively demonstrate an intention to hold exchange funds in trust. (*See* Kirpalani Dep. at 25:19-26:5, Doc. No. 145-55 ("I know for a fact, ... to a

certainty, that when I spoke with Michelle [Gluck] she told me that their intention was to hold the monies they received from customers in trust for the customers, and I warned her that if the company goes into bankruptcy you can't be certain that your intention, even if it's also the customers' intention, is going to prevail, and so given that that's your intention, you ought to think about beefing up your documents.").)  In light of the foregoing, the Court finds that there is nothing in the language of the form exchange agreement to support Plaintiffs' theory of a 6-year "ARS fraud."

Plaintiffs have also attempted to support their "ARS fraud" theory by asserting that LTIC and CLTIC provided LES's customers with "[m]isleading marketing materials," which "falsely claimed that LES would never place Exchange Funds in 'risky' investments as other exchange companies had done."  (Pls.' Br. Opp. at 5.)  Plaintiffs insist that these "false advertisements, ... were issued while Exchange Funds were being placed at risk" and show "the intent of enterprise members to defraud."  (*Id*.)  Plaintiffs further posit that the Defendants' nationwide transmission of these materials involved predicate acts of mail and wire fraud.  (*Id*.)

Here again, the proffered evidence fails to support Plaintiffs' allegations of fraud.  As part of their appendix, Plaintiffs submitted portions of two separate pamphlets or brochures that were apparently published in 2008.  (Pls.' Ex. 7, Doc. No. 122-2 at 10; Pls.' Ex. 14, Doc. No. 122-3 at 13.)  Both contain sections entitled "Investment of Client Funds."  Plaintiffs' Exhibit 7 states that "[n]either [LFG] nor [LES] hold any 'subprime mortgage' investments.  Client funds are never invested in, or at risk from such investments.  No LandAmerica entities have investment portfolio exposure to subprime mortgage risk through portfolio investments in such products."  (Pls.' Ex. 7, Doc. No. 122-2 at 10.)  Plaintiffs' Exhibit 14 similarly states that: "Clients can rest assured that [LFG] and [LES] do not hold any 'subprime mortgage'

investments, and that client funds are never invested in or at risk from such investments. No

LandAmerica entities have investment portfolio exposure to subprime mortgage risk through

portfolio investments in such products. Ernst & Young regularly reviews the soundness,

sufficiency and performance of the various investments of LandAmerica and its affiliates,

including [LES]." (Pls.' Ex. 14, Doc. No. 122-3 at 13.)

Even when viewing these materials in the light most favorable to Plaintiffs, the Court

cannot see how they reasonably support an inference of "ARS fraud." For one, Plaintiffs

represent that the aforementioned exhibits were published in 2008 (P71, P72) and, to the extent

they post-dated the February 2008 ARS market freeze, they are irrelevant to the time period

during which the "ARS fraud" allegedly occurred. Additionally, the materials in question

specifically disclaim only investments in subprime mortgages and any risks attendant thereto; the

brochures do not make any representations concerning ARSs, nor do they imply that exchange

funds are never invested. On the contrary, by referencing the "investment portfolios" of

"LandAmerica entities" and Ernst & Young's regular reviews of "the investments of

LandAmerica and its affiliates, including [LES]," the materials clearly disclosed, truthfully, that

LFG and LES did invest their holdings in what readers could presume was an effort to generate

greater profits for the companies.

The Court is also not persuaded that Plaintiffs' Exhibit 4 supports their theory of "ARS

fraud." (Pls.' Ex. 4, Doc. No. 122-2 at 2.) This exhibit is a press release issued by LES on June

1, 2007, in which Cheryl Springer, an LES production manager, contrasted LES with other

qualified intermediaries who had reportedly "absconded with the taxpayers' funds" or

"commingl[ed] funds, and [did] not have the financial stability to wire out funds on behalf of

clients in a timely manner." (*Id*.) There is nothing misleading about this statement, since there is

no evidence to suggest that anyone at LFG or LES had ever absconded with client funds or that, as of the press release date, LES had ever failed to wire out funds in a timely manner. Springer is also quoted as stating,

> Our clients know that we guarantee their funds, as well as segregated accounting of their funds. We also provide transaction security . . . key to a successful 1031 exchange . . . . In an Industry that includes a vast number of privately held, unregulated providers, [LES] stands out for its transparency, security and reliability in their finances and processes. For a secure 1031 exchange, contact [LES]. . . .

(*Id.*) Again, nothing in these statements supports the existence of a large scale fraud concerning LES's investment practices. For the most part, the remarks attributed to Springer constitute commonplace puffery, which is generally insufficient to support an allegation of fraud. Furthermore, Plaintiffs have not demonstrated that this particular press release, dated June 1, 2007, was commonly distributed to LES's customers prior to the February 2008 ARS freeze. Even if it was, the notion that exchangers were tricked into believing that their otherwise fungible exchange proceeds would not be used for investment purposes is especially tenuous in light of the unambiguous language in the exchange agreements, by which exchangers: (i) clearly agreed to divest themselves of any right or title to their funds during the exchange period, (ii) unambiguously agreed to vest exclusive dominion and control over the use of exchange funds in LES, and (iii) acknowledged that LES's obligations to its customers were limited to those expressly set forth in the exchange agreements. (*See* Form Exchange Agreement at ¶¶ 2(c), 6(c), and 11, Doc. No. 122-26 at 24, 27 and Doc. No. 122-27 at 1, 3.)

The Court is also not persuaded by Plaintiffs' conclusory suggestion that LES's severe liquidity deficit, following the wholesale freezing of the ARS market, was a "foreseeable consequence" of LES's investment practices. (Pls.' Br. Opp. at 6, Doc. No. 140 at 11). It is true that, when questioned whether he believed that the ARSs "had a risk of loss associated with

them," Evans acknowledged that "any security has some risk of loss associated with it." (P442, Doc. No. 150.) Gluck similarly testified that "securities are investments," as to which "there's no guarantee." (P466, Doc. No. 150.) On balance, however, the record does not support the conclusion that Defendants deliberately misled LES's customers about the risks posed by LES's investment in ARSs.

The risks associated with ARSs are highlighted in two publications that were obtained from LES's Trustee in the related bankruptcy proceedings and included in Plaintiffs' appendix. The first (i.e., Plaintiffs' "Exhibit 5") is a "Written Description of Material Auction Practices and Procedures" of SunTrust Robinson Humphrey, Inc., dated August 1, 2007. (Pls.' Ex. 5, Doc. No. 122-2 at 5-8.) This document explains that:

> Auction Rate Securities are auctioned at par so the return on the investment to the investor and the cost of financing to the issuer between auction dates is determined by the interest rate or dividend yield set through the auctions. The rate or yield is set through an auction in which bids with successively higher rates are accepted until all of the securities in the auction are sold. The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the auction until the next auction.
>
> ***
>
> If there are not enough bids to cover the securities for sale, this results in a failed auction and the issuer pays an above-market rate set by a pre-determined formula described in the disclosure documents, and all of the current holders continue to hold the securities. Our firm may place a bid (described below) in order to prevent a failed auction.

(Pls.' Ex. 5, Doc. No. 122-2 at 5-6.) The second document (i.e., Plaintiffs' "Exhibit 13") is a February 4, 2008 Merrill Lynch brochure entitled "Auction Market Securities." (Pls.' Ex. 13, Doc. No. 122-3 at 7-11.) This publication similarly explains that:

> A failed auction is one where there are more sellers than buyers, so that not all sellers can receive par value back. A failed auction is NOT a default.
>
> In the event of a fail the investor can either: 1) liquidate the securities in the secondary market, but at a lower price than par, or 2) hold onto the security

> through subsequent auctions until an auction clears, the legal final maturity date, or when the issue is called. For the investor who holds on, the issuer will continue to pay interest on the security at a pre-determined higher maximum rate, as described in the issuer's prospectus. . . .

(Pls.' Ex. 13, Doc. No. 122-3 at 9.)

Collectively, this evidence demonstrates that an investment in ARSs carried an inherent risk of a failed auction, the immediate effect of which would be "that such holders cannot sell their securities at auction and. . . may not be able to access the funds without a loss of principal, unless a future auction on the[ ] investments is successful or the issuer calls the security pursuant to a mandatory tender or redemption prior to maturity." (Pls.' Ex. 21, Doc. No. 122-5 at 7.) But the risk of any particular auction failing was also mitigated by the broker's ability, if it so chose, to step in and act as a "bidder of last resort" for ARSs that lacked an interested buyer. (See Pls.' Ex. 5, Doc. No. 122-2 at 7 ("STRH may, among other reasons, submit such a bid to avoid having a failed auction or to avoid having an auction clear at a rate that STRH, in good faith, believes is above its estimated market rate.")). *Accord* Brendan P. Tracy, *If It's Broken, Sometimes It Can't Be Fixed: Why the Auction Rate Securities Market Was Faulty from Its Inception and How Broker-Dealers Caused Its Downfall*, 4 BROOK. J. CORP. FIN. & COM. L. 297, 298 (2010) (noting that "[o]ver the last few decades, broker-dealers and investment banks have intervened in order to prevent auction failures, by acting as buyers of ... last resort, keeping the rate of failed auctions at a very low level," and discussing how that practice began to change in late 2007) (internal footnotes, citations, and quotation marks omitted) (ellipsis in the original); Sean T. Seelinger, *Auction-Rate Securities: A Fast & Furious Fall,* 13 N.C. Banking Inst. 287, 288 (Mar. 2009) ("To maintain liquidity, financial institutions bid on their own securities, creating a false sense of demand in the mind of investors."); Jason A. Richardson, *"We Were Never Told These Things Could Fail": An Overview of the Auction Rate Securities Market,* 15 PIABA B.J.

35

11, 13 (2008) (noting that, although they are not required to do so, "[a]s a matter of practice, brokerage firms have traditionally stepped in to prevent auction failures by bidding on enough securities to complete the auction").

In point of fact, Plaintiffs' own exhibits suggest that, prior to the February 2008 market freeze, ARSs were considered to be a high grade, relatively low risk investment. An internal corporate LFG memorandum from April 2008 indicates that the ARSs held by LES had a credit rating of "A" or higher and consisted entirely of debt instruments backed by student loans, "substantially all of which" were guaranteed by the United States government. (Pls.' Ex. 21, Doc. No. 122-5 at 6-7.) Ramos, who was LFG's treasurer -- and was responsible for the financial oversight of LES, testified that, prior to the 2008 ARS freeze, he understood ARSs to be a safe investment. (Ramos Dep. at 30:7-31:16, Doc. No. 122-60.) As of August 1, 2007, SunTrust Robinson Humphrey was offering ARSs as "an alternative to money market funds and other short-term high grade investments." (Pls.' Ex. 5, Doc. No. 122-2 at 5.) Even as late as February 4, 2008, Merrill Lynch advertised ARSs as "the conservative's conservative security." (Pls.' Ex. 13, Doc. No. 122-3 at 8.) Merrill's brochure acknowledged that "abnormally high" rates of returns on ARS were related to liquidity concerns" that had been ongoing since mid-2007, but it assured readers:

> We don't view the high spreads as a reason to worry. We are comfortable with the safety of auction securities from closed-end funds, municipals with an underlying credit rating of at least single –A, and Guaranteed Student Loan Issuers. We view the unusually high present level of rates as an opportunity rather than a cause for alarm.

(*Id.*) The brochure also represented that closed-end fund auctions "hardly ever fail" and "the historical default rate on investment grade municipal bonds is less than 0.1%, according to a Moody's report." (*Id.*, Doc. No. 122-3 at 9.) *Accord* Brendan P. Tracy, *If It's Broken,*

*Sometimes It Can't Be Fixed: Why the Auction Rate Securities Market Was Faulty from Its Inception and How Broker-Dealers Caused Its Downfall*, 4 BROOK. J. CORP. FIN. & COM. L. at 305 ("For over two decades, the auction rate securities market seemed to work seamlessly, with the market facilitat[ing] incredible amounts of volume among investors. Until late 2007, there were less than [fifty] failed auctions, which resulted in confidence among investors and a high demand for the auction rate securities.") (internal quotation marks, citations, and footnotes omitted; alterations in the original); Sean T. Seelinger, *Auction-Rate Securities: A Fast & Furious Fall,* 13 N.C. BANKING INST. at 287 (noting that auction-rate securities "were marketed to individual, retail investors and institutional investors as cash equivalents by many of Wall Street's leading financial institutions").

Ultimately, the event that precipitated LES's liquidity problems and the ensuing (alleged) "Ponzi scheme" was not the failure of any particular ARS auction (losses from which LFG might easily have absorbed), but rather the wholesale freezing of the entire ARS market in conjunction with the credit crisis of 2008. (*See* SAC ¶60 (citing a February 12, 2008 Wall Street Journal report that the market for ARS, "another seemingly safe corner of the credit markets, was succumbing to the credit crunch"); Pls.' Ex. 21, Doc. No. 122-5 at 7 (noting that, "as a result of liquidity issues in the global credit and capital markets, beginning in February 2008, the auctions for ARS started to 'fail' . . . .").) *Accord* Amod Choudhary, *Auction Rate Securities = Auction Risky Securities*, 11 DUQ. BUS. L.J. 23, 25–26 (Fall 2008) (noting, as of the Fall of 2008, that "the illiquidity risk" associated with ARSs "was thought to be a non-issue in the past, [but] has turned out to be an unforeseen but real risk that was borne out of the sub-prime mortgage meltdown and the ensuing credit crunch in the financial markets."). Plaintiffs have adduced no evidence to suggest that the catastrophic freezing of the credit markets in 2008 and the

corresponding systemic failure of the ARS markets was were risks that were foreseeable to – much less known and deliberately concealed by -- any of the enterprise members in the years preceding the alleged "Ponzi scheme."

In sum, the evidence does not support the conclusion that the alleged enterprise members were involved in a scheme or artifice to defraud §1031 exchangers during the six-year period that predated the freezing of the ARS market.  As a result, Plaintiffs have not demonstrated that the alleged RICO enterprise engaged in a pattern of mail or wire fraud– or other racketeering activity, for that matter – prior to February 2008.

### 2. Conduct Postdating the Alleged Ponzi Scheme

Plaintiffs also attempt to demonstrate a "continuous" pattern of racketeering by referring the Court to certain events that postdate the alleged 9-month "Ponzi scheme."  They point to three pieces of evidence which, they claim, demonstrate an attempt by Defendants to conceal their prior fraud.

First, Plaintiffs cite the deposition testimony of Watterson, which they claim was "perjured" in an effort to cover-up the alleged Ponzi scheme in this case.  At his deposition, Watterson testified that his LTIC branch office was not involved in §1031 exchanges as of November 2008 and played no role in the preparation of the Plaintiffs' exchange documents. Plaintiffs counter that Watterson was in fact instrumental in effectuating their agreement with LES and later assured them that, despite LES's bankruptcy, their exchange transaction would close because their funds had been placed in a safe and secure segregated LES account in accordance with Joseph Germinaro's prior instructions.  Plaintiffs argue that the only reason for Watterson and LTIC to issue false representations to them during the bankruptcy proceedings

and to falsely deny LTIC's involvement in their 2008 exchange was to help LTIC conceal its prior role in the fraud.

Second, Plaintiffs contend that Gluck provided false testimony when she was deposed in connection with this litigation. According to Plaintiffs, "Gluck, an attorney, testified that all three of [LFG's] outside law firms blessed LES's continued acceptance of Exchange Funds immediately after [SunTrust Bank made an] accusation that Exchangers were being defrauded. All these law firms deny it. It is clear that Gluck's sworn testimony about 'advice of counsel' was a fabrication to conceal a prior fraud and to create a false defense in this case." (Pls.' Br. Opp. Defs.' Mot. Summ. J. at 15, Doc. No. 140 at 20.)

Third, Plaintiffs contend that Gluck coordinated a fraud on the bankruptcy court when the bankruptcy counsel she hired on behalf of LFG and LES misrepresented to the bankruptcy judge that LES had neither held exchange funds in trust nor intended to do so. Plaintiffs maintain that "Gluck and her cohorts intended to mislead the court and obtain the fraudulently-induced ruling[s] [in *Frontier Pepper's Ferry* and *Millard Refrigerated Services*] so the estate could use Exchange Funds to pay professionals to obtain court-approval for LFG's sale of LTIC and CLTIC stock to Fidelity National Financial ("FNF"). . . ." (Pl.'s Br. Opp. at 20, Doc. No. 140 at 25.) Plaintiffs assert that "Gluck and her cohorts" did this because FNF "had agreed that, if the sale took place at fire-sale prices, it would reward Gluck and the other executives by paying them millions in bonuses." (*Id.*)

Plaintiffs' evidentiary proffer fails to demonstrate that there is a genuinely disputed fact relative to the length of the alleged RICO scheme. For one, Plaintiffs never sought leave to amend their SAC so as to include the alleged post-bankruptcy misconduct as part of the "RICO scheme," nor did they argue this theory in their initial summary judgment brief. (*See* Pls.' Br.

Supp. Mot. Summ. J. at 41-49, Doc. No. 120 at 48-56.) In addition, Plaintiffs have not persuasively explained how the aforementioned post-bankruptcy events constitute predicate acts of racketeering. Even if they had, the conduct attributed to Gluck and Watterson does not extend the time period of the alleged RICO scheme in this case. It bears repeating that the alleged RICO scheme centered around LES's allegedly fraudulent use of new exchange funds to satisfy the obligations of its older §1031 exchanges. By definition, the alleged RICO scheme involved a "closed period of repeated conduct," *H.J. Inc.*, 492 U.S. at 241, which ended as of November 2008 when LES ceased doing business and filed its bankruptcy petition. Any efforts that were taken thereafter by enterprise members to conceal their wrongdoing cannot, as a matter of law, extend the time-period of the alleged scheme. *See, e.g., Reinke v. Potamkin Golden Mile Motors, Inc.*, No. CIV. A. 97-5740, 1998 WL 314677, at *4 (E.D. Pa. May 22, 1998) ("Even if actions to hide the alleged racketeering activity qualify as predicate acts, they do not extend the time of the underlying scheme.")(citing *Midwest Grinding v. Spitz*, 976 F.2d 1016, 1024 (7th Cir.1992), and *Phila. Reserve Supply Co. v. Norwalk & Assoc., Inc.*, Civ. A. No. 91–0449, 1992 WL 210590, *6 (E.D. Pa.1992)).

Having fully considered the parties' respective arguments, as well as the evidence bearing on this issue, the Court is not persuaded that Plaintiffs have produced evidence sufficient to support the requisite continuity of the alleged RICO scheme. Accordingly, Plaintiffs' RICO claim under §1962(c) is insufficient as a matter of law, and the Court will therefore grant Defendants' motion for summary judgment as to that cause of action.

###   B.   PLAINTIFFS' §1962(D) CLAIM

Plaintiffs also assert a claim of RICO conspiracy pursuant to 18 U.S.C. §1962(d). In order to establish a §1962(d) claim, Plaintiffs must show (1) an agreement to commit the

predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c).  *Wallace v. Powell*, No. 3:09-CV-0291, 2015 WL 9268445, at \*10 (M.D. Pa. Dec. 21, 2015) (citing *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989)).  In the context of this case, Plaintiffs must first establish their §1962(c) claim in order to prevail on their RICO conspiracy claim.  *See Annulli v. Panikkar,* 200 F.3d 189, 198 (3d Cir. 1999), *overruled on other grounds by Rotella v. Wood,* 528 U.S. 549 (2000).  For the reasons discussed, Plaintiffs cannot do so.  Consequently, the deficiencies in Plaintiffs' §1962(c) claim necessarily defeat their §1962(d) conspiracy claim as well.  *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir.1993) ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 must necessarily fail if the substantive claims are themselves deficient."); *Yucaipa Am. All. Fund I, L.P. v. Ehrlich*, No. CV 15-373 (SLR), 2016 WL 4582519, at \*13 (D. Del. Sept. 2, 2016) (plaintiffs' failure to successfully allege a §1962(c) RICO claim necessitated the dismissal of their §1962(d) conspiracy claim).

### C.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Also pending before the Court is the Plaintiffs' cross-motion for summary judgment. Plaintiffs contend that the undisputed facts in this case support a finding of RICO liability as a matter of law.  The foregoing discussion demonstrates that Plaintiffs cannot prevail on the claims they have asserted under 18 U.S.C. §1962(c) and §1962(d).  Accordingly, Plaintiffs' motion will be denied.

**V.  CONCLUSION**

Based upon the foregoing reasons, Defendants' motion for summary judgment as to Count 3 of the Second Amended Complaint will be granted, and Plaintiffs' cross-motion for summary judgment as to liability will be denied.

An appropriate order follows.


*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


Date:   February 21, 2017


cc/ecf:  All counsel of record